# 24-1352-cv

## United States Court of Appeals

### *for the*

### Second Circuit

BANOKA S.A.R.L., ATYS S.A., RENATO PICCIOTTO,
JACQUES CHAMPY, JEAN BISSONNET,

*Petitioners-Appellants,*

— v. —

ALVAREZ & MARSAL, INC., ALVAREZ & MARSAL TRANSACTION
ADVISORY GROUP, LLC, ALVAREZ & MARSAL HOLDINGS, LLC,
ELLIOTT MANAGEMENT CORPORATION, ELLIOTT INVESTMENT
MANAGEMENT, L.P., ELLIOTT ASSOCIATES, L.P.,
ELLIOTT INTERNATIONAL, L.P.,

*Respondents-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX FOR
## PETITIONERS-APPELLANTS

ALEXANDER D. PENCU
CHRISTOPHER J. MAJOR
AUSTIN D. KIM
MEISTER SEELIG & FEIN PLLC
*Attorneys for Petitioners-Appellants*
125 Park Avenue, 7th Floor
New York, New York 10017
(212) 655-3500

 COUNSEL PRESS · (800) 4-APPEAL · (331534)

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned counsel for Applicants-Appellants Banoka S.à.r.l., and ATYS S.A. (private non-governmental parties) certifies that neither of these parties has publicly held corporate parents, affiliates, and/or subsidiaries.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................... ii

INTRODUCTION .....................................................................................1

JURISDICTIONAL STATEMENT ..........................................................10

ISSUES PRESENTED.............................................................................12

STATEMENT OF THE CASE .................................................................13

SUMMARY OF FACTS ..........................................................................15

    I.      The English Proceeding ...............................................15

    II.     The Section 1782 Application.....................................16

    III.    The CVH Transaction .................................................18

        A.    Westmont Manufactures Due Diligence Concerns...................19

        B.    Westmont Seeks Additional Price Reductions and Concessions..................................................21

    IV.    Prior Section 1782 Application.....................................23

    V.     Magistrate Judge Parker's Order and Banoka's Objection.................26

    VI.    District Court's *Intel* Factor Order.................................27

SUMMARY OF ARGUMENT .................................................................30

STANDARD OF REVIEW .......................................................................35

ARGUMENT ..........................................................................................37

    I.      The District Court Misapplied the Third and Fourth *Intel* Factors .............................................37

    II.     The District Court's Third *Intel* Factor Analysis Impermissibly Imposed Extra-Statutory Barriers to Section 1782 Discovery...................................38

        A.    There Are No Issues of Foreign Discoverability .....................40

        B.    The District Court Erred in Relying on The Forum Selection Clause.................................47

    III.    The District Court Misapplied the Fourth *Intel* Factor .....................54

CONCLUSION .......................................................................................61

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Banoka v. Westmont Int'l Development Inc.*,
2022 WL 480118 (S.D. Tex. Feb. 10, 2022)...................................................25

*Bissonnet v. Westmont Int'l Development, Inc.*,
2021 WL 5872496 (5th Cir. Dec. 10, 2021).................................................24

*Bissonnet v. Westmont Int'l Development, Inc.*,
2022 WL 636680 (5th Cir. Mar. 4, 2022) ...................................................25

*Chevron Corp. v. Berlinger*,
629 F.3d 297 (2d Cir. 2011) ..........................................................36

*Elfenbein v. Gulf & Western Industries, Inc.*,
590 F.2d 445 (2d Cir. 1978) ..........................................................11

*Euromepa S.A. v. Esmerian, Inc.*,
51 F.3d 1095 (2d Cir. 1995) ...................................... 36, 43, 45, 55

*Fed. Rep. of Nigeria v. VR Advisory Services, Ltd.*,
27 F.4th 136 (2d Cir. 2022) ................................................. *passim*

*Heraeus, Kulzer, GmbH v. Biomet, Inc.*,
633 F.3d 591 (7th Cir. 2011) ..........................................................55

*In re Accent Delight Int'l Ltd.*,
791 Fed.App'x .......................................................................39

*In re Accent Delight Int'l Ltd.*,
869 F.3d 121 (2d Cir. 2017) ..........................................................10

*In re Aldunate*,
3 F.3d 54 (2d Cir. 1993) ...................................................... 35, 46

*In re Alghanim*,
2022 WL 1423088 (S.D.N.Y. May 5, 2022) ........................................ 51, 52

*In re B&C Kb Holding GmbH*,
2024 WL 3170983 (2d Cir. June 26, 2024).................................................35

*In re Bayer AG*,
146 F.3d 188 (3d Cir. 1998) ..........................................................35

*In re BonSens.org*,
   95 F.4th 75 (2d Cir. 2024) ...............................................................36

*In re del Valle Ruiz*,
   939 F.3d 520 (2d Cir. 2019) ....................................... 38, 52, 59, 61

*In re DNG FZE*,
   2024 WL 124694 (S.D.N.Y. Jan 11. 2024) ............................ 51, 52

*In re Esses*,
   101 F.3d 873 (2d Cir. 1996) ............................................... 42, 44

*In re Kreke Immobilien KG*,
   2013 WL 5966916 (S.D.N.Y. Nov. 6, 2013) ......................... 51, 52

*In re Malev*,
   964 F.2d 97 (2d Cir. 1992) ..............................................................54

*In re Metallgesellschaft AG*,
   121 F.3d 77. (2d Cir. 1997) ....................................... 38, 43, 44, 47

*In re Naranjo*,
   768 F.3d 332 (4th Cir. 2014) ..........................................................11

*In re Republic of Ecuador*,
   735 F.3d 1179 (10th Cir. 2013) ......................................................11

*In re Saul Klein*,
   2023 WL 8827847 (S.D.N.Y. Dec. 21, 2023) ....................... 51, 52

*In re Sims*,
   534 F.3d 117 (2d Cir. 2008) ..........................................................36

*Intel Corp. v. Advanced Micro Devices, Inc.*,
   542 U.S. 241 (2004) ............................................................... *passim*

*Martinez v. Bloomberg LP*,
   740 F.3d 211 (2d. Cir. 2014) ..........................................................48

*Matter of Federal Grand Jury Proceedings*,
   760 F.2d 436 (2d Cir. 1985) ..........................................................11

*Mees v. Buiter*,
   793 F.3d 291 (2d Cir. 2015) ................................................. *passim*

*Mirlis v. Greer*,
   80 F.4th 377 (2d. Cir. 2023) ..........................................................59

*Sergeeva v. Tripleton Int'l Ltd.*,
    834 F.3d 1194 (11th Cir. 2016) ............................................................ 59, 60

*Societe Nationale Industrielle Aeropatiale v.*
    *U.S. Dist. Court for Southern Dis. Of Iowa*,
    482 U.S. 522 (1987) .................................................................................53

**Statutes & Other Authorities:**

28 U.S.C. § 1291 ...................................................................................10

28 U.S.C. § 1331 ...................................................................................10

28 U.S.C. § 1782 .......................................................................... *passim*

28 U.S.C. § 1782(a) ...............................................................................38

Fed. R. App. 4(a)(2) ..............................................................................10

Fed. R. Civ. 26 ......................................................................................54

Applicants-Appellants Banoka S.à.r.l., ATYS S.A., Renato Picciotto, Jacques Champy and Jean Bissonnet (together "Banoka") appeal the Transcript Decision dated April 11, 2024, and the April 16, 2024 Order adopting the Transcript Decision by the United States District Court for the Southern District of New York (Woods, J.), (together the "Order"), which denied Banoka's request to issue subpoenas (the "Application") pursuant to 28 U.S.C. §1782. Banoka's Application under Section 1782 sought discovery from the Elliott Respondents-Appellees ("Elliott")[1] and the A&M Respondents-Appellees ("A&M")[2] for use in a contemplated foreign proceeding in the English High Court of Justice (the "English Proceeding") against non-party Westmont International Development Inc. ("Westmont"). Banoka appeals as to all the Elliott Respondents, but does not appeal the Order as to the A&M Respondents.

## INTRODUCTION

Congress enacted Section 1782 to provide an efficient means of U.S. discovery for use in foreign litigations and to encourage other countries to do the same. The district court's Order, finally issued more than twenty months after Banoka filed its Application, violates these twin aims of the statute, by blocking

---

[1] The Elliott Respondents-Appellees are Elliott Management Corporation ("Elliott Management"), Elliott Investment Management, L.P. ("Elliott Investment Management"), Elliott Associates, L.P. ("Elliott Associates"), and Elliott International, L.P. ("Elliott International").

[2] The A&M Respondents-Appellees are Alvarez & Marsal Transaction Advisory Group, LLC and Alvarez & Marsal Holdings, LLC.

Banoka from any discovery whatsoever based on non-existent concerns hypothesized by the district court. The record does not support the district court's conclusions, and there was no basis for the district court applying the third and fourth *Intel* factors against Banoka.

Banoka seeks discovery in aid of its contemplated English law fraud claims against Westmont. In December 2019, Westmont fraudulently induced Banoka into an exclusive deal to sell to Westmont (the "CVH Transaction") Banoka's shares in Clichy Victor Hugo ("CVH"), a French limited liability company that owned and operated a Holiday Inn branded hotel in Paris, France (the "Hotel"). After locking Banoka into the transaction and preventing Banoka from negotiating in the marketplace, Westmont demanded massive price concessions in bad faith. Westmont's pre-planned bait and switch deprived Banoka of its opportunity to sell the highly valuable Hotel, and cost Banoka millions in damages. Banoka seeks to sue Westmont in England, and to aid that litigation Banoka seeks discovery in the U.S. under Section 1782.

The Respondents in this Section 1782 proceeding were participants on Westmont's side of the transaction, but are not targets in Banoka's contemplated English Proceeding. Respondents' respective roles in the fraudulent CVH Transaction gave them access to documents and information that are highly relevant to Banoka's English law fraud claims.

Respondents Elliott Associates and Elliott International (together the "Elliott Funds") were Westmont's co-investor in the CVH Transaction through a joint venture investment vehicle, WNE Investor, S.à.r.l. ("WNE Investor"). [A.831 (¶7)].[3] The Elliott Funds were the "substantial majority owner" of WNE Investor. *Id.* Respondents Elliott Management and Elliott Investment Management (together the "Elliott Advisor Entities") are the Elliott Funds' affiliated investment advisors, and Elliott Investment Management "has served as investment advisor to the Elliott Funds…since January 1, 2020." [A.831 (¶¶3-5)]. The Chief Executive Officers of Elliott Management, Paul Singer and James Pollock, also manage and direct the affiliated Elliott investment advisors and funds, including Elliott Investment Management, Elliott International, and Elliott's UK-based investment advisor, Elliott Advisors (UK) Limited ("Elliott UK").[4]

Respondent A&M served as Westmont's due diligence consultant for the CVH Transaction. Westmont cited purported due diligence concerns raised by A&M as Westmont's pretense for seeking massive price concessions and ultimately reneging on the Hotel purchase in bad faith.

---

[3] Citations to "[A.___]" are to the Appendix and citations to "[SPA.___]" are to the Special Appendix.

[4] https://www.elliottmgmt.com/who-we-are/jonathan-pollock/; https://find-and-update.company-information.service.gov.uk/company/02989338/officers;https://www.sec.gov/Archives/edgar/data/937611/000101359424000482/xslForm13F_X02/primary_doc.xml

Banoka filed this Application two years ago seeking the efficient discovery for which Congress provided in Section 1782. Lengthy motion practice ensued. The district court initially referred the Application to a U.S. magistrate, and the magistrate recommended that the district court deny the Application for failure to meet Section 1782's statutory requirements. The district court rejected the magistrate's recommendation that Banoka did not meet Section 1782's statutory requirements. The district court also held that the first and second factors set forth by the Supreme Court in *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004), weighed in favor of discovery. However, the district court denied Banoka Section 1782 discovery based on the third and fourth *Intel* factors.

In the district court's introductory remarks when it dictated its decision from the bench, the district court stated it was "going to grant in part the petition with respect to Respondent Elliott Associates, L.P. and Elliott International, L.P. …." [SPA.47 (4:3-7)]. However, the district court actually ordered no discovery at all. The district court imposed excessive scope restrictions to restrict discovery to the shell Elliott Fund entities that have no employees, and lack the capacity to send or receive documents, while prohibiting the discovery of documents sent or received by the funds' investment advisors that maintained full operational control over the Elliott Funds. [SPA.63-64 (20:13-21:15); SPA.10-11 (10:21-25)]. Elliott has

confirmed that, based on the district court's severe restrictions on scope, Elliott has zero documents to produce. [A.1122].

The district court imposed the excessive scope restrictions despite record evidence that Elliott operates as a unified business operation, and Elliott's admission that "the way [Elliott's] business works," the Elliott Funds have possession, custody and control over their U.K. and U.S. investment advisors' documents. [SPA.10 (10:13-20); SPA.13 (13:7-9); SPA. (14:6-7)]. The district court's Order denied the Application in its entirety, while inviting Banoka to resubmit sharply curtailed subpoenas for the district court to reconsider as to the Elliott Funds that lack the capacity to send, receive, or create anything. [SPA.64 ("I will evaluate any renewed application for a subpoena [to the Elliott Funds] to determine whether the requests as framed remain overbroad, unduly burdensome, and disproportionate to the needs of the case")]. Elliott confirmed to the district court both before and after the district court issued its Order, that despite the fact that the Elliott Funds were the "substantial majority owner" of the special purpose vehicle used for the CVH Transaction, the district court's excessive restrictions absolved Elliott of having to produce any discovery at all. [A.831 (¶7); A.1122; SPA.10 (10:21-23)].

The district court also denied the Application as to A&M and the Elliott Advisor Entities that advise and manage the Elliott Funds' onshore and offshore

5

investments. [SPA.62 (19:18-22); A.831 (¶¶3-4)]. Moreover, the district court ruled that Banoka cannot take any depositions. [SPA.58].

Banoka is limiting this appeal to the discovery it seeks from Elliott, and is not appealing the branch of the district court's Order concerning A&M. In denying Banoka Section 1782 discovery from Elliott, the district court misapplied the third and fourth *Intel* factors.

As to the third *Intel* factor, which asks whether the Section 1782 application conceals an attempt to circumvent a foreign restriction on proof-gathering, the district court conceded that Respondents identified no "English 'prohibitions' on the use or acquisition" of the discovery sought in this Section 1782 proceeding. [SPA.56 (13:22-24)]. The lack of any evidence of a restriction or policy against proof-gathering should have ended the district court's third *Intel* factor analysis in Banoka's favor. However, the district court still concluded that the third *Intel* factor weighed against discovery from all Respondents. [SPA.53 (10:12-15)].

The district court wrongly relied on the existence of an English forum selection clause between Banoka and Westmont to "tilt" the third *Intel* factor against allowing discovery against Respondents, none of whom are signatories to the forum selection clause or closely related to Westmont. [SPA.54 (11:8-9)]. The English forum selection clause lands the contemplated litigation between Banoka and Westmont in England, but it is no bar to discovery from Elliott in the U.S. under

Section 1782 to aid that English Proceeding. Despite acknowledging that Section 1782 contains no foreign discoverability requirement, the district court nonetheless relied heavily on purported discoverability issues based exclusively on Respondents' speculative allegations of how an English court might exercise its discretion, while disregarding Banoka's authoritative challenge to Respondents' speculations. [SPA.57 (14:4-13); A.920].

The district court's foreign discoverability analysis overlooked the highest court of England's unqualified endorsement of Section 1782 as a lawful means for "any party preparing his case in the High Court" of England "to obtain in a foreign country…documentary evidence which they believe they need in order to prepare and present their case." [A.256]. This authoritative proof rendered Respondents' speculation as to what may be permissible in England at best irrelevant to a Section 1782 analysis. Plenary review by this Court of the district court's clear legal error is warranted and necessary to vindicate the twin aims of Section 1782.

Moreover, the district court provided no legal basis to distinguish between English litigants based on the method by which English court jurisdiction is established in England. Under a fair reading of the Order, the district court placed great weight on the forum selection clause between Banoka and Westmont in blocking Banoka from taking discovery from Elliott. The district court declined to hold that Respondents had standing to enforce the forum selection clause, but rather

held that "the fact that petitioner agreed to pursue litigation related to the transaction in the U.K., subject to U.K. proof-gathering limitations, weighs against granting the petition." [SPA.56 (13:18-21)]. The district court's reasoning was circular and wrong. It held there were no English proof-gathering restrictions demonstrated, but yet concluded that Banoka's submission to jurisdiction in England to sue Westmont subjected it to the unidentified "U.K. proof-gathering limitations" and "weighs against granting the petition." [SPA.56 (13:15-21)]. It was error for the district court to rely on non-existent proof-gathering restrictions to find that the third *Intel* factor weighed against discovery.

The district court also wrongly concluded that the fourth *Intel* factor, which asks whether the Section 1782 requests are unduly intrusive or burdensome, weighed against the Application. In finding against Banoka on the fourth *Intel* factor, the district court cited generic overbreadth and burden concerns, despite recognizing that the Elliott Funds "have a direct connection to the transaction with Westmont" [SPA.60-61 (17:24-25)], and record evidence that the Elliott Advisor Entities are the investment advisors for the Elliott Funds' onshore and offshore investments. [A.831 (¶¶3-5)].

The contemplated English Proceeding concerns a €55 million (approximately $57.96 million U.S.) transaction. Standard document production and depositions are not disproportionate with the needs of the case, which will require proof of

Westmont's intent. To prove intent, Banoka obviously needs and therefore seeks in this Section 1782 proceeding the production of the contemporaneous documents and communications between Westmont, its partners the Elliott Funds, and the Elliott Funds' Advisor Entities.

The record is uncontroverted that the Elliott Funds are shell entities through which Elliott invests, and the record is also uncontroverted that the Elliott Advisor Entities direct and act for the Elliott Funds. [SPA.10 (10:21-25)]. The Elliott Funds have no employees and no capacity to create, send or receive anything. *Id*. Rather, the Elliott Funds operate exclusively through their onshore and offshore investment advisors, including Elliott Investment Management, who act as agents for the Elliott Funds. [SPA.10 (10:21-25); A.831 (¶¶3-5)]. Moreover, the affiliated Elliott entities operate as a single business unit with a shared document storage platform. [SPA.10 (10:13-20) ("the way [Elliott] is structured is that the firm has two funds [the Elliott Funds], and then it has investment advisors, both on shore and offshore")]; SPA.13 (13:7-9)].

Consistent with the Federal Rules, which govern discovery in Section 1782 proceedings, Banoka is entitled to discovery within Elliott's possession, custody or control. Therefore, the district court was overly restrictive when it stated it would only consider a subpoena seeking documents "to which Elliott Associates, L.P. and Elliott International, L.P. [*i.e.*, the Elliott Funds] are parties, or signatories, or direct

participants." [SPA.63 (20:13-16)]. Elliott confirmed this restriction means Elliott will produce nothing. [A.1122].

The Court should correct the district court's abuse of discretion so that Banoka can obtain the discovery to which it is entitled and it needs for the English Proceeding. Doing so will further the twin aims of Section 1782. Specifically, the Court should reverse the district court's Order, and hold that the *Intel* factors weigh in favor of granting Banoka document production and depositions from Elliott in accordance with Banoka's proposed subpoenas. [A.190-A.229].

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction pursuant to 28 U.S.C. §1331, because Banoka's application for discovery was made pursuant to 28 U.S.C. §1782. Banoka's notice of appeal was timely filed on May 13, 2024 in accordance with Fed.R.App. 4(a)(2).

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. §1291, because the appeal is from the final Order, entered on April 16, 2024. *See In re Accent Delight Int'l Ltd.*, 869 F.3d 121, 128 (2d Cir. 2017) ("Orders granting (or denying) applications for discovery under Section 1782 are considered final adjudications and are immediately appealable pursuant to 28 United States Code Section 1291").

The district court resolved and "affirmatively decided" all issues related to the scope of permissible Section 1782 discovery. *See In re Republic of Ecuador*, 735 F.3d 1179, 1183 (10th Cir. 2013) ("once the district court affirmatively decided the proper scope of discovery under the Republic's application [for Section 1782 discovery], it disposed of all 'evidentiary requests'"). Moreover, because Section "1782 applications aid foreign proceedings, [the Circuit Courts] are not concerned with any underlying merits proceeding in the United States. Lacking an 'underlying' proceeding, many of the concerns that make us reluctant to review discovery orders on an interlocutory basis disappear." *In re Naranjo*, 768 F.3d 332, 346-47 (4th Cir. 2014) (noting that "[e]very other circuit court that has considered the jurisdictional issue presented here has found subject matter jurisdiction to hear an immediate appeal from an order on a § 1782 application").

The fact that the district court invited Banoka to submit a "renewed application" [SPA.68] does not impact the finality of the Order. *See Matter of Federal Grand Jury Proceedings*, 760 F.2d 436, 438 (2d Cir. 1985) ("That the district court left appellant free to renew his motion for access does not make the order nonappealable now…."); *see also Elfenbein v. Gulf & Western Industries, Inc.*, 590 F.2d 445, 448 (2d Cir. 1978) (order of dismissal "without prejudice to its renewal" is a "final order").

This is particularly true here, where Elliott has already confirmed that the district court's excessive scope limitations, limiting discovery to shell entities that lack the capacity to send, receive or create documents, unsurprisingly returned no responsive documents. [A.1122]. Elliott represented as follows:

> During the meet-and-confer sessions, counsel for the Elliott Respondents explained to Petitioners' counsel that EALP and EILP [i.e., the Elliott Funds] do not have directors, officers, or employees and therefore do not have any individuals who would have generated e-mail or other documents on behalf of the Elliott Funds regarding the contemplated transaction, which was never consummated, with Westmont International Development Inc. Accordingly, although the Elliott Respondents agreed to turn over any responsive documents in accordance with the Court's order, counsel explained that the Elliott Funds do not have possession, custody, or control of any responsive or relevant documents as to which the Elliott Funds were 'parties, or signatories, or direct participants.'

[A.1122]. Therefore, the district court's Order denied depositions outright and, through the extreme scope restrictions, denied any document production at all. Having crafted an Order that, by Elliott's own admission, effectively bars any discovery whatsoever, there is nothing left for the district court to do. Thus, this Court can review and should reverse the district court's final Order.

## ISSUES PRESENTED

1.     Did the district court err in applying the third *Intel* factor, by finding that Banoka should not obtain discovery from Elliott because Banoka submitted its dispute with Westmont to the English courts, including English proof-gathering restrictions, even though the district court acknowledged there is no evidence in the

record of any English proof-gathering restrictions, and authoritative proof that as a matter of English policy each English litigant is responsible for obtaining, through lawful means, the evidence needed to plead and prove their case, including Section 1782?

2.      Did the district court err in applying the fourth *Intel* factor to deny the requested discovery as disproportionate to the needs of Banoka's contemplated English Proceeding because Banoka sought depositions and Banoka sought documents in Elliott's possession, custody, or control rather than only seeking non-existent documents signed, authored, or received by the shell Elliott Funds?

3.      Did the district court commit reversible error when it denied the Application as to Respondents Elliott Management and Elliott Investment Management based on the purported absence of evidence tying these entities to the CVH Transaction, contrary to the record evidence that both Elliott Management and Elliott Investment are investment advisors for the Elliott Funds, including with respect to the subject CVH Transaction?

## STATEMENT OF THE CASE

On July 15, 2022, Banoka filed its Section 1782 Application to conduct discovery in the Southern District of New York in aid of the contemplated English Proceeding. [A.5].   Respondents appeared, and opposed the Application on September 28, 2022.   [A.339; A.418].   The district court quickly referred the

Application to a U.S. magistrate, and, on February 1, 2023, the magistrate (Parker, J.) denied the Application, finding that Banoka did not satisfy Section 1782's statutory "for use" element (the "Magistrate Order"). [A.992]. The Magistrate Order did not address the *Intel* factors. Banoka objected to the Magistrate Order on February 15, 2023 (the "Objection") [A.1007], and, on March 22, 2024, the district court (Woods, J.) sustained the Objection and found that Banoka satisfied Section 1782's statutory requirements in full. [A.1103].

On April 16, 2024, the district court issued the Order denying the Application, finding that while the first and second *Intel* factors favored Section 1782 discovery, the third and fourth *Intel* factors weighed against discovery. Specifically, the district court held that Banoka's discovery requests were "unduly overbroad," and that purported issues of foreign discoverability and an English forum selection clause between Banoka and Westmont (for litigation between them) weighed against granting the Application. [SPA.57 (14:9-17); SPA.58 (15:13-5)]. In the Order, the district court stated that it would reconsider a renewed subpoena with respect to the Elliott Funds that omitted any depositions and dramatically narrowed the scope of documents to those that were signed, sent, or received by the Elliott Funds. [SPA.62 (19:18-22); SPA.68]. Elliott confirmed the district court's restrictions on document production mean that Elliott would produce zero documents. [A.1122]. Banoka appeals these arbitrary restrictions on its Section 1782 discovery.

The district court misapplied the third and fourth *Intel* factors to block basic Section 1782 discovery. It cited the forum selection clause between Banoka and Westmont to conclude that Banoka had subjected itself to the jurisdiction of England and its proof-gathering restrictions. But the district court acknowledged that there was no evidence in the record in this Section 1782 proceeding of any English proof-gathering restrictions. The district court was wrong on the law to hold that the forum selection clause would impact discovery under Section 1782, and wrong on the facts to assume proof-gathering restrictions under English law despite acknowledging the lack of any evidence in the record of such restrictions.

The district court also erred in its application of the fourth *Intel* factor, by finding basic discovery to be disproportional with the needs of Banoka's contemplated English Proceeding. A fraud case requires proof, including of the defendant's intent that is usually outside of the plaintiff's own documents and information. Therefore, discovery is key, and Section 1782 is supposed to yield that discovery efficiently in aid of foreign proceedings so that the U.S. serves as a standard bearer for discoverability and the truth-seeking function of courts.

## SUMMARY OF FACTS

### I. The English Proceeding

Banoka seeks discovery in aid of its contemplated English Proceeding concerning the fraud Westmont perpetrated against Banoka in connection with

Banoka's attempt to consummate the CVH Transaction. CVH is a French limited liability company that owned and operated the Holiday Inn branded Hotel in Paris, France. [A.32-33 (¶¶3-5, 25-33].

Westmont fraudulently induced Banoka to grant Westmont exclusive negotiating rights to acquire Banoka's shares in CVH based on representations that Westmont would pay Banoka €55 million (appx. $57.96 million U.S.) for the CVH shares. [A.32-33 (¶5)]. Westmont never intended to pay €55 million for the CVH shares. The purpose of Westmont's offer was to terminate Banoka's ongoing negotiations with third parties, and, after eliminating its competitors, Westmont manufactured due diligence issues purportedly raised by A&M to extract financial concessions from Banoka and delay the CVH Transaction.

In reliance on Westmont's representations, Banoka terminated its ongoing negotiations with competing bidders. Having trapped Banoka, on the eve of the scheduled closing, Westmont demanded in bad faith a wholesale rewrite of the CVH Transaction with a more than $7 million (USD) discount. [A.109-112]. The transaction never closed, and Banoka suffered millions of dollars in damages.

## II.    The Section 1782 Application

In the Application, Banoka sought discovery from Elliott in its role as Westmont's co-investor and A&M in its role as due diligence advisor for the CVH Transaction. Elliott and A&M are in possession of key, relevant evidence

concerning Westmont's fraud, including the facts surrounding Westmont's intention with its initial agreement and subsequent demand to rewrite the CVH Transaction.

The Elliott Funds are New York-based investment funds that operate through their affiliated onshore and offshore investment advisors. [A.831 (¶¶3-5); SPA.10 (10:13-20)]. The funds were Westmont's co-investor in the CVH Transaction through a joint investment venture, WNE Investor Sarl ("WNE Investor"). [A.831 (¶7)]. Because the Elliott Funds "do not have separate employees, don't create documents," and lack capacity to make independent decisions, all investment decisions are made by the Elliott Funds' affiliated investment advisors, including the Elliott Advisor Entities from which Banoka necessarily seeks discovery. [A.831 (¶¶3-5)]; [SPA.10 (10:21-25)].

A&M was retained as WNE Investor's due diligence consultant for the CVH Transaction. [A.369]. Westmont used purported "due diligence" issues raised in A&M's reports as the basis to delay the CVH Transaction and coerce a massive, non-market discount in the acquisition price for Banoka's shares in CVH. [A.34-38 (¶¶13-24)]. Westmont's alleged "due diligence" analysis was a ruse to disingenuously justify rewriting the terms of the CVH Transaction with a more than $7 million (USD) discount after Westmont's fraudulent inducement left Banoka with no alternative negotiating partners. [A.40-41 (¶¶30-33)].

### III.   The CVH Transaction

In late-June 2019, Banoka fielded offers for the purchase of all shares of CVH (the "Shares"). [A.32 (¶4)]. On September 20, 2019, Westmont submitted an initial offer to purchase the Shares for €53 million. [A.32 (¶4); A.44-50]. After concluding that the initial offers were too low, on October 3, 2019, Banoka invited bidders to submit a second round of offers for the purchase of the Shares. [A.32 (¶¶4-5)].

During this second round of solicitation, Westmont requested that Banoka terminate discussions with other bidders and agree to an exclusive negotiation period with Westmont (the "Exclusivity Agreement"). [A.32 (¶5)]. Banoka only agreed to the Exclusivity Agreement in exchange for Westmont increasing its offer price to €55 million and Westmont's representation that it would work in good faith to promptly close on the purchase. *Id*. On October 16, 2019, Westmont agreed, and submitted a revised final offer to purchase the Shares for €55 million (the "Offer Letter"). [A.52-55]. Section 1 of the Offer Letter required Westmont to pay the full €55 million purchase price in cash at closing "without any retention and, deferred element." [A.52]. Respondents in this Section 1782 proceeding are not parties or intended beneficiaries of the Offer Letter, and are not targets in the contemplated English Proceeding.

Banoka appointed Cofis S.A. ("Cofis") to manage and negotiate the proposed CVH Transaction with Westmont. [A.33 (¶7)]. On October 17, 2019, Cofis confirmed in writing that Westmont's €55 million offer was "an appropriate basis for discussion" and, subject to any extensions, the exclusivity period was scheduled to terminate on December 31, 2019. [A.33 (¶8); A.63-70]. During the exclusivity period, Westmont was to complete its due diligence, and the parties were to negotiate and finalize the parties' share purchase agreement ("SPA"). [A.33-34 (¶9)]. Based on Westmont's representations, Banoka terminated its negotiations with competing bidders for the CVH Shares. [A.42 (¶38)].

## A. **Westmont Manufactures Due Diligence Concerns**

While Westmont entered into the Exclusivity Agreement and represented to Banoka that Westmont would negotiate the CVH Transaction in good faith, Westmont had the exact opposite intention. After signing the Exclusivity Agreement, Westmont delayed the CVH Transaction unnecessarily, raised irrelevant inquiries, repeatedly postponed the signing date for the SPA and, ultimately, ceased to give any instructions to Westmont's attorneys on proceeding with the CVH Transaction. [A.34-35 (¶13)].

On December 9, 2019, Westmont's representative sent a letter claiming to raise "*red flags*" based on A&M's alleged due diligence into the Hotel's financial records. [A.35 (¶14); A.71-73; A.133-137]. Three days later, on December 12,

19

2019, Westmont demanded a €2 million reduction purportedly to address Westmont's due diligence concerns. [A.36 (¶18)]. In order to disarm Banoka's suspicions and to induce Banoka to continue forward with the exclusive negotiations, Westmont represented to Banoka that Westmont was committed to closing on the CVH Transaction. For example, Westmont's representative Mr. Drake emailed Banoka's representative Mr. Didelot on December 12, 2019 stating: "We are 99% in agreement on the SPA, and we still want to execute on this transaction." [A.36 (¶18); A.71-73]. Westmont timed this assurance to induce Banoka into providing a further extension of the exclusivity period and to soften Banoka to agree to sharply discount the price of the CVH shares.

After investigating Westmont's complaints, Banoka confirmed that the alleged "due diligence" concerns were unfounded and failed to provide a basis to extend the closing date for the CVH Transaction. [A.35-36 (¶¶15-16)]. Although Westmont's purported concerns were unfounded, in reliance on Westmont's representations of its continued commitment to the CVH Transaction, and trapped by the fraudulently induced exclusivity period, Banoka agreed to a €1 million discount to the purchase price. [A.36 (¶19)]. In further reliance on Westmont's representations that the SPA would be executed and that Westmont would quickly close the CVH Transaction, on December 20, 2019 Banoka agreed to extend the exclusivity period to January 31, 2020. [A.36 (¶20); A.74-76]. During the

extension, Banoka remained precluded from pursuing a transaction with other buyers, and Banoka continued to incur additional fees and expenses pursuing the CVH Transaction with Westmont.

Throughout the course of the negotiations, Westmont professed cooperation and progress to conceal Westmont's true intention of pressuring Banoka into a massive, non-market discount at the last minute. For instance, on January 22, 2020, Westmont asked whether the contract negotiations with the Hotel's gas supplier could wait until March "when we [*i.e.*, Westmont] definitely are owners" of CVH. [A.37 (¶23)]. Again, this statement was optimally timed to coincide with the need for a further extension of the exclusivity period. In reliance on Westmont's representation that Westmont intended to sign and close by March 2020, Banoka was forced to agree to a second extension of the exclusivity period, this time to February 12, 2020. [A.37-38 (¶23); A.77-79].

### B. Westmont Seeks Additional Price Reductions and Concessions

At the end of January and beginning of February 2020, Westmont ceased all communications with Banoka's chief negotiator. [A.38-39 (¶25)]. With the benefit of hindsight, Banoka believes that during this time period Westmont was considering options for even further delay and planning pressure tactics to capitalize on Banoka not being able to negotiate with other parties, especially in light of the emergent COVID-19 virus. *Id.*

As the COVID-19 pandemic developed, Westmont instructed its attorneys to raise queries as a delay tactic while Westmont prepared a fundamental reformulation of the CVH Transaction, including by invoking COVID-19 as a pretext for a dramatic shift in the balance of risk between the parties. [A.39 (¶26)].

On February 13, 2020, one day after the extension of the exclusivity period had expired, Westmont's attorneys postponed the target date for signing based on the pretext that there was an outstanding consultant report relevant to the CVH Transaction. [A.39 (¶27)]. In reality, the consultant report was only a condition precedent to the closing of the CVH Transaction, not the signing of the SPA. *Id.*

On February 18, 2020, following inquiries from Banoka's attorneys, Westmont's attorneys responded that they lacked instructions for how to proceed, but that they nevertheless anticipated that the signing would take place on February 21, 2020. [A.39-40 (¶29); A.88-90]. On February 21, 2020, Westmont falsely represented to Banoka that the CVH Transaction was still on track with some outstanding items, and further stated that the signing would take place on February 26, 2020. [A.39-40 (¶29); A.94-95]. On February 25, 2020, however, Westmont communicated with the broker for the CVH Transaction, Christie's, to lay the groundwork for a wholesale recalculation of the purchase price to introduce an "earn-out structure." [A.40 (¶30)]. Furthermore, on February 26, 2020, Christie's informed Banoka that Westmont's board had "frozen" its representative's signatory

22

powers, and accordingly the CVH Transaction would be further delayed.  [A.40 (¶30); A.96-99].

Between February 25 to February 28, 2020, Westmont sought to renegotiate the purchase price aggressively on the purported basis of the impact of the COVID-19 pandemic.  [A.40-41 (¶31)].  In addition, Westmont used Elliott as an excuse to further delay the closing, claiming that "all investments must go through [Elliott's] special committee," and that the Elliott's approval process would delay the CVH Transaction by an additional week.  [A.109-112].

Then, on February 27, 2020, Westmont revealed its true intentions and proposed a drastic reduction in the purchase price for the CVH Shares under a future "Earn Out" formula that shifted all the risk to the Shareholders.  [A.40-41 (¶31); A.106-108].    Banoka rejected Westmont's last-minute demand to renegotiate the CVH Transaction.  [A.41 (¶32); A.109-112].  Accordingly, the parties did not sign the SPA and never closed the CVH Transaction.

## IV.    Prior Section 1782 Application

On December 4, 2020, Banoka commenced Section 1782 proceedings against Westmont in the Southern District of Texas, where Westmont maintains its global headquarters, for discovery in aid of the English Proceeding.  *See In re Petition of Banoka S.á.r.l, ATYS S.A. et al*., Case No. 4:20-cv-04131 (S.D. Tex. Dec. 4, 2020) (the "Prior Application") (ECF 1).    In the Prior Application, Banoka sought

discovery from Westmont concerning, *inter alia*, Westmont's offer to acquire the CVH shares, Westmont's requests to extend the exclusive negotiating period from December 2019 to February 2020, due diligence files concerning Westmont's purported plans to acquire the CVH Shares, and internal files concerning Westmont's Offer Letter and later attempts to renegotiate the CVH Transaction. *Id.* (ECF 3).

On December 11, 2020, the Court (Gilmore, J.) granted the Prior Application and authorized the issuance of a subpoena to Westmont (the "Westmont Subpoena"). *See* Prior Application (ECF 2 and ECF 3). On February 19, 2021, Westmont moved to quash the Westmont Subpoena (*id.*, ECF 17) (the "Motion to Quash"), and on July 26, 2021, Judge Gilmore denied the Motion to Quash (*id.*, ECF 26) (the "Quash Order"). Westmont appealed the Quash Order to the Fifth Circuit Court of Appeals.

On December 13, 2021, the Fifth Circuit vacated the Quash Order and remanded the proceedings for Judge Gilmore to provide additional reasoning to support her findings that Banoka's application satisfied Section 1782's statutory factors, include a more detailed analysis of the *Intel* factors, and also to address whether, under Fifth Circuit precedent, Section 1782 authorizes extraterritorial discovery. *See Bissonnet v. Westmont Int'l Development, Inc.*, 2021 WL 5872496, *1 (5th Cir. Dec. 10, 2021). Due to Judge Gilmore's retirement, the Prior Application was reassigned to District Court Judge George C. Hanks.

On remand, Judge Hanks issued a "Response to the Fifth Circuit's Order Dated December 10, 2021" (the "Response"). *Banoka v. Westmont Int'l Development Inc.*, 2022 WL 480118 (S.D. Tex. Feb. 10, 2022). Judge Hanks did not grant or deny Westmont's Motion to Quash. Rather, consistent with the Fifth Circuit's directive, Judge Hanks simply answered the Fifth Circuit's questions and returned the Response to the Fifth Circuit. Judge Hanks concluded that, although Banoka satisfied Section 1782's statutory factors and Section 1782 does not preclude extraterritorial discovery, Banoka's forum selection clause with Westmont required Banoka to seek disclosure from Westmont in accordance with English pre-suit disclosure procedures. *Id.*, at *4-*5. As for the *Intel* factors, Judge Hanks concluded that because Westmont was the target of the English Proceeding, and because Banoka's forum selection agreement with Westmont required that all disputes with Westmont arising from the CVH Transaction be litigated before the English courts, the *Intel* factors weighed against Banoka. *Id.*, at *5.

Although the Response did not grant or deny the Motion to Quash, on March 4, 2022, the Fifth Circuit accepted the Response as an order granting the Motion to Quash and in a four-line order "affirm[ed]" the Response "for essentially the same reasons set forth by the district court." *Bissonnet v. Westmont Int'l Development, Inc.*, 2022 WL 636680, *1 (5th Cir. Mar. 4, 2022).

25

### V.    Magistrate Judge Parker's Order and Banoka's Objection

Banoka filed the present Section 1782 Application in the Southern District of New York on July 15, 2022.  [A.5].  On July 21, 2022, the district court (Woods, J.) referred the Application to a magistrate judge (Parker, J.). [A.7].   Respondents appeared and opposed the Application.  [A.339; A.418].

On February 1, 2023, the magistrate judge denied the Application on the basis that Banoka failed to satisfy Section 1782's "for use" statutory requirement. [A.1002-1006].  The magistrate judge reasoned that the English Proceeding was not within "reasonable contemplation" because Banoka lacked sufficient information to commence suit against Westmont, and therefore Banoka could not sustain its pleading burden under English law. [A.1003].  The Magistrate Order was limited to consideration of Section 1782's statutory factors and did not address the discretionary *Intel* factors.

Banoka timely objected to the Magistrate Order [A.1007], and on March 22, 2024, the district court issued a Memorandum Opinion and Order rejecting the portion of the Magistrate Order finding that Banoka did not satisfy Section 1782's "for use" statutory requirement [A.1103-1117] (the "Objection Order").   In the Objection Order, the district court found that Banoka had "articulated the legal theory for their proposed proceeding [and] identif[ied] the forum" and target for the English Proceeding (Westmont), and that Banoka's "detailed pre-suit demand letter"

26

and "sworn declaration from [Banoka's] counsel describing [Banoka's] proposed claims and the factual basis for those claims" were sufficient to find that the English Proceeding was within reasonable contemplation, and thus, satisfied Section 1782's "for use" requirement. [A.1114, 1116].

The district court vacated the Magistrate Order and scheduled further proceedings to address the discretionary *Intel* factors not addressed in the Magistrate Order. [A.1117].

## VI. District Court's *Intel* Factor Order

On April 10, 2024, the district court held oral argument to address the *Intel* factors. [SPA.1]. The next day, the district court issued the Transcript Decision. [SPA.44]. In the Transcript Decision, the district court denied Banoka's request for authorization to issue the subpoenas attached to the Application, with leave to submit a "renewed application" on an extremely limited basis and as to the Elliott Funds only. [SPA.66 (23:6-22); SPA.68]. In the Transcript Decision, the district court held that while the first and second *Intel* factors weighed in favor of granting the Application, the third and fourth *Intel* factors weighed against Banoka's Application. [SPA.49-66].

As to the first *Intel* factor, which asks "whether the person from whom discovery is a participant in the foreign proceeding," the district court held that the factor "weighs in favor of granting the petition with respect to both the Elliott and

27

A&M respondents," because the English Proceeding is "against Westmont only," and "therefore would not place any of the respondents within the 'foreign tribunal's jurisdictional reach.'" [SPA.49-51 (6:7-19, 7:17-25, 8:20-23)]. In reaching this finding, the district court accepted Banoka's representation that discovery obtained in this Section 1782 proceeding would be used "only in the contemplated proceeding against Westmont," and "not use[d]…in connection with an action against respondents." [SPA.51 (8:7-19)].

The district court also found that the second *Intel* factor, which considers whether the foreign jurisdiction has issued a "clear directive" that prohibits the use of discovery obtained in the United States, weighed in Banoka's favor. [SPA.53 (10:12-15)]. The district court found that Respondents "offered no…authoritative proof" that the English courts prohibit the use of Section 1782 to obtain discovery in aid of English proceedings, and that Banoka "identified several cases in which English courts have endorsed the use of Section 1782 to obtain nonparty discovery," and that the "English courts would be receptive to the discovery" Banoka seeks. [SPA.52 (9:19-25)].

The district court held that the third *Intel* factor weighed against discovery, despite finding that Respondents identified no "English 'prohibitions' on the use or acquisition" of Section 1782 discovery. [SPA.56 (13:22-25); SPA.57 (14:14-17)]. Despite finding no evidence of circumvention of any proof-gathering restrictions by

28

Banoka, the district court concluded that Banoka's forum selection clause with Westmont, together with Elliott's allegation that an English court "would be unlikely to allow petitioners to seek pre-suit discovery," weighed against granting the Application.  [SPA.56-57 (13:22-14:17)].

As to the fourth *Intel* factor, the district court held that Banoka's subpoenas requesting documents and information regarding the CVH Transaction with a defined time period of just fourteen months and subject matter limited to the CVH Transaction was "unduly burdensome" and "disproportionate to the needs" of the English Proceeding.  [SPA.62 (19:13-17)].  The district court denied Banoka's request for authorization to serve the subpoenas attached to the Application as to all the Respondents, with leave to submit a "renewed application" as to the Elliott Funds only due to funds' "direct connection to the transaction with Westmont."  [SPA.61 (18:1-4); SPA.66 (23:6-16)].

The district court imposed the following scope restrictions for any "renewed application" for Section 1782 discovery from the Elliott Funds:  (1)  "Records received must be used only in connection with the contemplated proceeding against Westmont and may not be used in a proceeding against the respondents;" (2) Banoka "may only seek responsive materials located in the United States;" (3) Banoka "may only seek documentary materials with respect to which [the Elliott Funds] are parties, or signatories, or direct participants," because it "would be unduly

29

burdensome and disproportionate to the needs of this case to the extent the discovery sought are records of [the Elliott Funds' affiliated investment advisor] to which the other Elliott entities have access as a result of a shared IT platform, or a contractual or other right to request production of such records to them;" and (4) "the parties must meet and confer to limit the scope of the discovery requests." [SPA.62-64 (19:23-20:22, 21:16-25)]. The district court also prohibited any deposition testimony whatsoever, citing the generic expense of depositions. [SPA.58]. Elliott confirmed that the district court's restrictions meant that it had zero documents to produce. [A.1122].

In accordance with the Order, the parties met and conferred to discuss any potential "renewed application" for Section 1782 discovery from the Elliott Funds and submitted a status report to the district court on May 1, 2024. [SPA.68; A.1119-1125]. Unsurprisingly, the Elliott Funds took the position that the district court's Order absolved them from producing anything. [A.1122]. The district court has taken no further action.

## SUMMARY OF ARGUMENT

The district court's Order obstructs the twin aims of Section 1782. More than twenty months after Banoka filed its Application, the district court twisted the *Intel* factors to deny Banoka targeted discovery in aid of the English Proceeding.

The third *Intel* factor asks whether the Section 1782 application conceals an attempt to circumvent a foreign or U.S. restriction or policy against proof-gathering. The district court erred when, despite expressly finding that the record contained no evidence of any English restriction or policy against proof-gathering, held that the third *Intel* factor weighed against granting Banoka discovery. Once the district court found no evidence of any policy or restriction against proof-gathering, the district court should have concluded the third *Intel* factor weighed in Banoka's favor.

The district court's contrary finding was premised on: (1) the district court's impermissible consideration of Respondents' speculations on foreign law to manufacture an issue of "foreign discoverability;" and (2) Banoka's agreement to sue Westmont in England, which, according to the district court, included Banoka's acquiescence to English proof-gathering restrictions. Of course, given the lack of any record evidence of such proof-gathering restrictions, there was no basis for the district court to then link the forum selection clause with the nonexistent English proof-gathering restrictions to turn down the Application.

The district court, in effect, artificially created a two-tiered system for English litigants seeking Section 1782 discovery, where English litigants who voluntarily submit to the jurisdiction of the English courts face obstacles that no other English litigant seeking Section 1782 discovery must clear. The discretion granted by Section 1782 does not allow the district court to create such arbitrary roadblocks to

31

Section 1782 discovery that are untethered to Section 1782's statutory language or the *Intel* factors.

To reach its conclusion, the district court relied on purported issues of "foreign discoverability" based exclusively on Respondents' speculation about English law on pre-suit disclosure and Respondents' speculative allegation that an English court might have a negative view on the ultimate merits of Banoka's foreign law claims. The ultimate merits of Banoka's foreign law claims are irrelevant to a Section 1782 analysis, as is Respondents' speculation on discoverability issues under English law, particularly where the district court found there was no evidence in the record of restrictions.

The district court also overlooked authoritative proof from England's highest court, which explicitly endorsed the use of Section 1782 by "any party" appearing before the English courts, and held that Section 1782 is in no way inconsistent with English procedures. [A.256]. In light of this pronouncement, there was no basis for the district court to find that, by voluntarily submitting to the jurisdiction of the English courts, Banoka and Westmont somehow intended to place themselves in a worse position than every other litigant appearing before the English courts with less rights and tools to procure evidence in the U.S.

Second, in the guise of an exercise of discretion, the district court wrongly imposed excessive restrictions on the scope of discovery to effectively deny Banoka

32

access to any discovery. The district court also erroneously determined that Banoka's requests for discovery were unduly burdensome even though Respondents provided no evidence of the alleged burden imposed by complying with Banoka's subpoenas.

The scope and use of Section 1782 discovery is governed by the Federal Rules. The district court abused its discretion when it restricted the scope of discovery to documents created, signed, sent or received by the Elliott Funds, which are shell fund entities with no employees, no documents, and no ability to create, send or receive anything.

The district court compounded its error when it held that documents, admittedly within the possession, custody and control of the Elliott Funds, were nonetheless outside the scope of discovery if created, sent or received by the affiliated Elliott investment advisors, including the funds' New York-based investment advisors, that maintained full operational and management control over the Elliott Funds.

Elliott structured its business operations to use the Elliott Funds as shell corporate vehicles to deploy capital, but without any ability to take independent action. Under these circumstances, it was an abuse of discretion for the district court to exclude the funds' affiliated investment advisor agents from the scope of discovery. The district court also erred when it barred, as too expensive and

33

disruptive, depositions and basic document production in a commercial dispute over a €55 million transaction.

Also, the district court's generic claims of burden are unsupported by the record. Respondents offered no evidence as to any alleged compliance burden, nor did they dispute the relevance of the documents and information Banoka seeks through the Application. Banoka seeks a discrete set of documents related to a single transaction, the CVH Transaction, for a 14-month period. The district court did not engage in any analysis to determine whether Banoka's discovery requests were permissible under the Federal Rules. Instead, the district court rested on its erroneous opinion that Respondents' speculative assertions of foreign law qualified as evidence of a "proof-gathering restriction[]," and that the mere existence of a forum selection agreement was sufficient to make a finding of "forum shopping." [SPA.64 (21:4-6)].

The district court also committed reversible error when it denied the Application as to Elliott Management and Elliott Investment Management. The record evidence demonstrates that both entities serve as investment advisors to the Elliott Funds. Moreover, as Elliott concedes, both Elliott Management and Elliott Investment Management were not only aware of the CVH Transaction, but these entities admittedly are in possession, custody and control over documents responsive to Banoka's subpoenas. Further, while the district court relied on Elliott's

representations that an offshore investment advisor affiliate, Elliott UK, was also an investment advisor for the CVH Transaction, publicly available records show that the same individuals who control Elliott Management are integral members of Elliott UK. The district court also overlooked record evidence that Elliott operated as a single unified business operation with a "special committee" through which "all investments," including the CVH Investment, were vetted. [A.110].

## STANDARD OF REVIEW

Although a review of a district court's application of the *Intel* factors is ordinarily for abuse of discretion, the "question of whether section 1782 imposes limitations on the district court's exercise of discretion is a question of law," that this Court reviews *de novo*. *In re Aldunate*, 3 F.3d 54, 58 (2d Cir. 1993). "While the ultimate decision to grant or deny an application is discretionary, we have cautioned that courts are not free to read extra statutory barriers to discovery into section 1782 under the guise of their discretion." *In re B&C Kb Holding GmbH*, 2024 WL 3170983, *2 (2d Cir. June 26, 2024); *see also In re Bayer AG*, 146 F.3d 188, 191 (3d Cir. 1998) ("Where the district court misinterpreted or misapplied the law, however, or where the court relied on inappropriate factors in the exercise of discretion, our review is plenary").

The district court's discretion is not unfettered. "In exercising its discretion, the district court must consider the twin aims of the statute: providing efficient

35

means of assistance to participants in international litigation in our federal courts; and encouraging foreign countries by example to provide similar means of assistance to our courts." *In re BonSens.org*, 95 F.4th 75, 79-80 (2d Cir. 2024). A district court has "abuse[d] its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *In re Sims*, 534 F.3d 117, 132 (2d Cir. 2008). An abuse of discretion is established where the district court denies a Section 1782 application on "inappropriate grounds" or "misapplie[s] [Second Circuit] guiding precedents." *Euromepa S.A. v. Esmerian, Inc.*, 51 F.3d 1095, 1097 (2d Cir. 1995).

A district court's factual findings are reviewed for clear error. *See Chevron Corp. v. Berlinger*, 629 F.3d 297, 306 (2d Cir. 2011).

The Court should conduct a plenary review of the district court's findings on the third *Intel* factor, because the district court engrafted a discoverability test onto the factor in contravention of the Supreme Court's decision in *Intel* and this Court's precedent. Moreover, the district court's analysis of the third factor was based on a clearly wrong factual finding. The district court recognized that Respondents proffered no evidence of any English proof-gathering restriction, but yet inexplicably ruled that by entering into an English forum selection clause with Westmont, Banoka subjected itself to non-existent English proof-gathering restrictions and that these non-existent restrictions tilted the third *Intel* factor against

36

discovery. [*compare* SPA.56 (13:22-24 ("the parties have not identified any English 'prohibitions' on the use or acquisition of the requested materials") *and* SPA.56 (Banoka's "forum selection clause…weighs against granting the petition" because Banoka agreed to be "subject to U.K. proof-gathering limitations")].

The Court should apply the abuse of discretion standard to the district court's fourth *Intel* factor analysis. The district court denied discovery altogether, in a fraud case over a €55 million transaction, where discovery is essential to building a case.

Even if this Court applies the abuse of discretion standard on both factors, the Court should reverse the Order, because the district court abused its discretion when it failed to apply the *Intel* factors consistent with the policy goals of the statute.

## ARGUMENT

### I.    The District Court Misapplied the Third and Fourth *Intel* Factors

In *Intel*, the Supreme Court identified four "non-exclusive factors … to be considered in light of the 'twin aims' of Section 1782 …. (1) whether 'the person from whom discovery is sought is a participant in the foreign proceeding,' … (2) 'the nature of the foreign tribunal … and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court assistance'; (3) 'whether the §1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States'; and (4)

whether the request is 'unduly intrusive or burdensome.'" *In re del Valle Ruiz*, 939 F.3d 520, 533-34 (2d Cir. 2019) (quoting *Intel*, 542 U.S. at 264-65).

The discretion provided by Section 1782 to district courts must be exercised consistent with the "twin aims" of Section 1782 to "provid[e] efficient means of assistance to participants in international litigations in our federal courts and encourag[e] foreign countries by example to provide similar means of assistance to our courts...." *In re Metallgesellschaft AG*, 121 F.3d 77, 79. (2d Cir. 1997). District courts "are not free to read extra-statutory barriers to discovery into section 1782 under the guise of exercising their discretion." *Fed. Rep. of Nigeria v. VR Advisory Services, Ltd.*, 27 F.4th 136, 148 (2d Cir. 2022).

## II. The District Court's Third *Intel* Factor Analysis Impermissibly Imposed Extra-Statutory Barriers to Section 1782 Discovery

The third *Intel* factor asks "whether the §1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States." *Intel*, 542 U.S. at 265. "In the context of §1782 and the third *Intel* factor, circumvention occurs where the applicant uses a §1782 application to avoid measures that are *intended* to restrict certain means of gathering or using evidence." *Fed. Rep. of Nigeria*, 27 F.4th at 153 (emphasis in original). Critically for this appeal, proof-gathering restrictions are "rules akin to privileges that *prohibit* the acquisition or use of certain materials, rather than as rules that *fail to facilitate* investigation of claims." *Mees v. Buiter*, 793 F.3d 291, 303 n.20 (2d

38

Cir. 2015) (emphasis in original). No English rule against disclosure, let alone a rule that rises to the level of a privilege, was identified in the record before the district court by any Respondent or the district court.

Indeed, the district court expressly conceded the lack of any proof in the record of any restriction or policy against proof-gathering in England. The district court explicitly held that there was no evidence of "any English 'prohibitions' on the use or acquisition" of the discovery sought in this proceeding. [SPA.56-57 (13:22-14-17)]. That is, the district court recognized there was no policy or restriction against proof-gathering. *See In re Accent Delight Int'l Ltd.*, 791 Fed.App'x at 251 (a finding of circumvention requires authoritative proof of a "policy or restriction[]…[that] *prohibit[s]* the discovery sought") (emphasis in original). With no policy or restriction against proof-gathering, there was nothing for Banoka to allegedly circumvent. *See Fed. Rep. of Nigeria*, 27 F.4th at 153 ("Something that is 'circumvented' must be an obstacle that one ordinarily would expect to encounter"). Thus, the district court's own finding of no proof-gathering restriction should have placed the third *Intel* factor in favor of Banoka's Application.

The district court's third *Intel* factor analysis should have concluded once the district court confirmed the absence of any authoritative proof of a policy or restriction against proof-gathering. However, "under the guise of exercising [its] discretion," the district court held that collateral issues of "foreign discoverability"

and Banoka's forum selection agreement tilted the third *Intel* factor against Banoka. *See Fed. Rep. of Nigeria*, 27 F.4th at 148; [SPA.57 (14:9-17)]. The district court provided no textual or legal support for its finding that, despite the absence of any policy or restriction against proof-gathering, the Application was nonetheless an attempt to circumvent "foreign proof-gathering restrictions or other policies of a foreign country or the United States." *Intel*, 542 U.S. at 265.

Nowhere in the Order did the district court articulate how an alleged issue of "foreign discoverability" or a forum selection clause embodied a restriction or policy against proof-gathering. The discretion provided by Section 1782 "is not a license to engage in a free-ranging policy analysis of any given application without a basis in the *Intel* factors or the broader 'twin aims' of the statute." *See Fed. Rep. of Nigeria*, 27 F.4th at 153. This is precisely what the district court did when, in violation of the Congressional "twin aims" of Section 1782 and *Intel*, it substituted the third *Intel* factor with extraneous considerations untethered to a restriction or policy against proof-gathering. *Intel*, 542 U.S. at 248-49 ("Section 1782 is the product of congressional efforts, over the span of nearly 150 years, to provide federal-court assistance in gathering evidence for use in foreign tribunals").

## A. <u>There Are No Issues of Foreign Discoverability</u>

The district court's finding that purported issues of "foreign discoverability" weighed against granting the Application is flawed for at least the following three

reasons: (1) the district court itself acknowledged the lack of any evidence in the record of English proof-gathering restrictions; and the district court impermissibly relied on Respondents' speculation as to how an English court might apply English law to block pre-suit disclosure as an issue of "foreign discoverability" [SPA.56-57 (13:22-14:8)]; (2) the district court erred when it overlooked Banoka's challenge to Respondents' interpretation of English law and resolved disputed issues of foreign law in Respondents' favor [SPA.57 (14:4-9); A.920, 934]; and (3) the district court improperly cherry-picked between the inconsistent positions taken by A&M and Elliott to accept A&M's argument that English law does not authorize third party discovery and rejected Elliott's contrary argument that third party discovery is permitted under English law [SPA.56 (13:24-25); A.357 (A&M); A.453 (¶15 (Elliott))].

First, the district court itself acknowledged there was no evidence of any English proof-gathering restrictions. The district court held that there were no "English 'prohibitions' on the use or acquisition of the requested materials," *i.e.*, there were no issues of "foreign discoverability." [SPA.56 (13:22-24)]; *see Intel*, 542 U.S. at 260 ("foreign discoverability" considers whether the relevant foreign tribunal permits the discovery of the materials sought by the Section 1782 applicant).

Unable to identify an actual issue of "foreign discoverability," the district court mischaracterized the record to state that Respondents "argue that there are no

41

available procedures under English law through which petitioners could obtain the requested discovery." [SPA.56-57 (13:24-14:1)]. To the contrary, Elliott argued that there were numerous "potential avenues in the English courts" Banoka could have used to obtain non-party disclosure. [A.451-457 (¶¶8-23)]. Elliott merely speculates that an English court may have a negative view on the merits of Banoka's foreign law claims and, on that basis, an English court may deny a similar request for discovery. [A.455 (¶20)]. But there is no proof in the record that an English court would block the discovery. Regardless, the questions are whether the discovery is authorized under Section 1782 and whether the English court would accept the evidence. Both questions are indisputably answered in the affirmative, and the district court should have granted the discovery.

Elliott's speculation on foreign law and the ultimate merits of Banoka's foreign law claims are irrelevant to a Section 1782 analysis. *See Mees*, 793 F.3d at 299 ("even in the context of our own laws, the question of who will ultimately prevail on what evidence can usually only be a subject of speculation at the pleading stage"); *see also In re Esses*, 101 F.3d 873, 876 (2d Cir. 1996) ("only upon 'authoritative proof that a foreign tribunal would *reject* evidence obtained with the aid of section 1782,' should a district court refrain from granting the assistance offered by the act") (emphasis in original);[A.455-456 (¶¶19-22)].

The district court abused its discretion when it grounded its "foreign discoverability" analysis on the "inherently unreliable method" of relying on Respondents' speculative, "superficial," and "biased interpretation[]" of English law. *See Euromepa*, 51 F.3d at 1199-1100; [SPA.57 (14:4-9) *citing* A.448]. The district court's "analytic approach" of relying on Respondents' speculation on issues of foreign law, while overlooking Banoka's contrary "authoritative proof," "promoted the very thing that section 1782 was intended to avoid…[a] speculative foray[] into legal territories unfamiliar to federal judges," that "cannot possibly promote the 'twin aims' of the statute." *Euromepa*, 51 F.3d at 1099-1100 ("We think that it is unwise—as well as in tension with the aims of section 1782—for district judges to try to glean the accepted practices and attitudes of other nations from what are likely to be conflicting and, perhaps, biased interpretations of foreign law"); *see also In re Metallgesellschaft*, 121 F.3d at 80 ("If district courts were free to refuse discovery based upon its unavailability in a foreign court or because the foreign court had not first passed on the discoverability of the material sought, §1782 would be irrelevant to much international litigation, frustrating its underlying purpose"); [SPA.57 (14:4-9); *see e.g.* A.455-457 (¶¶19-23)].

Second, the district court's finding that Banoka "d[id] not dispute" Respondents' speculation that an English court "would be unlikely" to allow Banoka to conduct similar discovery, mischaracterizes the record. [SPA.57 (14:4-9)]. In

fact, Banoka expressly challenged Elliott's biased interpretations of foreign law and "conjecture as to how an English court would evaluate a hypothetical request," which conjecture falsely assumed that "the English court would accept [Elliott's] version of disputed facts." [A.920; *see also* A.256]. Banoka also pointed out that Elliott "identifie[d] no proof-gathering restrictions and merely suggest[ed] that the scope of English discovery [was] less generous than US courts," which in itself is not a basis to deny Section 1782 discovery. *Id*; *see also Mees*, 793 F.3d at 302 ("Few if any foreign jurisdictions permit the scope of discovery available in our courts").

Banoka also challenged A&M's misplaced reliance on a non-authoritative treatise to argue that an English court might deny a similar request for discovery as "unconscionable." [A.934]; *see also In re Esses*, 101 F.3d at 877 (a foreign legal treatise is not "authoritative proof of offense to a foreign jurisdiction"). England's highest court rejected the idea that an English litigant's use of Section 1782 is inconsistent with the procedures of the English courts. [A.934; *see also* A.258 (an English litigant's use of Section 1782 poses "no…interference with the procedure of the English High Court…as would amount to unconscionable conduct….")].

The district court abused its discretion when it overlooked "authoritative proof" from England's highest court, and sworn statements from Banoka's English counsel attesting to the permissive policy of the English courts to leave it to each "party to obtain the material upon which it wishes to rely to pursue his case" (A.27-

30 (¶¶39-43)), and instead relied on A&M's speculative arguments based on a non-authoritative treatise. *See Euromepa*, 51 F.3d at 1100 ("a district court's inquiry into the discoverability of requested materials should consider only authoritative proof" from the foreign jurisdiction).

Third, the district court further erred when it credited A&M's claim that Banoka purportedly "admit[ted]" it could not obtain non-party disclosure in England. [SPA.57 (14:4-9) citing [A.357]]. Banoka never made any such "admission," and A&M cited to nothing in the record to support this assertion. Further, A&M's position is contradicted by Elliott, which argued that there are numerous "other potential avenues" under English law to obtain non-party disclosure. [A.357; A.457 (¶23)]. While Elliott speculates that an English court would rule in its favor in a hypothetical proceeding for discovery, Elliott's speculative allegations are irrelevant to Section 1782 discovery, which occurs here in the U.S. under the Federal Rules. [A.457 (¶23)].

While the district court stated that Respondents "cited to case law," nothing in the Order indicates that the district court considered any "case law" or did more than simply accept at face value Respondents' speculation as to how an English court might exercise its discretionary authority. [SPA.57 (14:4-13)]. Even if the district court identified an issue of "foreign discoverability," which it never did, under *Intel* "foreign discoverability" must be considered in light of the scope and purpose of a

district court's discretionary authority as embodied in the legislative history of Section 1782 and this Court's precedent. The legislative history of Section 1782 "indicates that '[i]n exercising its discretionary power, the court *may* take into account the nature and attitudes of the government of the country from which the request emanates and the character of the proceedings in that country." *In re Aldunate*, 3 F.3d at 59 (emphasis in original).

The district court erred when it overlooked the express directives given by the English courts that, when given the option of pursuing discovery pursuant to English procedures or Section 1782, there is "no good reason why [an English litigant] should not…cho[ose] whichever of these two alternatives they preferred." [A.256]. The policy of the English courts is consistent with this Court's precedent that "[i]f there are two equally valid means to the same end and neither is meant to restrict use of the other, the choice of one over the other is not circumvention." *Fed. Rep. of Nigeria*, 27 F.4th at 153. Where, as here, the English courts have adopted a policy that favors the use of Section 1782 by English litigants, denying an application for Section 1782 discovery based on non-existent issues "foreign discoverability" is "senseless" and "serve[s] only to thwart §1782(a)'s objective to assist foreign tribunals in obtaining relevant information that the tribunals may find useful but, for reasons having no bearing on international comity, they cannot obtain under their own laws." *Intel*, 542 U.S. at 262.

The district court's Order "undermin[ed] the twin aims" of Section 1782 when it credited Respondents' speculative allegations to manufacture an issue of "foreign discoverability." [SPA.57 (14:4-8) citing A.448]; *see also In re Metallgesellschaft*, 121 F.3d at 80 ("a district court should not refrain from granting [Section 1782] assistance…based simply on allegations" "that a foreign tribunal would reject the evidence obtained with the aid of section 1782"). Even if Respondents had offered authoritative proof that the English procedures do "not provide a *mechanism* for such discovery…[t]hat a country does not enable broad discovery within a litigation does not mean it has a policy that restricts parties from obtaining evidence through other lawful means." *Mees*, 793 F.3d at 303 n. 20.

Although the district court stated that "foreign discoverability" was not given "undue weight," a fair reading of the Order is that it was given substantial weight as there were no other reasons for tilting the third *Intel* factor against Banoka. Because the district court failed to identify an actual issue of "foreign discoverability," it was error for the district court to give any weight at all to "foreign discoverability." [SPA.57 (14:9-12)].

### B. The District Court Erred in Relying on The Forum Selection Clause

The district court erred when it held that the English forum selection clause in the agreement between Banoka and Westmont was "relevant" to the court's third *Intel* factor analysis without tying the forum selection agreement to any restriction

47

or policy against proof-gathering. [A.54 ("This Letter shall be governed by English law and the courts of England and Wales shall have exclusive jurisdiction in relation to any dispute raising out of or in relation to this letter")]; [SPA.55 (12:7-12); SPA.56 (13:14-21); SPA.57 (14:9-13)].

Consistent with this Court's precedent, a forum selection agreement is relevant to a Section 1782 analysis only if the agreement can be "properly understood as embodying a proof-gathering restriction, or at least a policy *preference* for use of its processes over other means by which [the Section 1782 applicant] can gather evidence in the United States…." *Fed. Rep. of Nigeria*, 27 F.4th at 153 (abuse of discretion for district court to find that a bilateral assistance treaty between Nigeria and the United States was intended to limit the use of Section 1782) (emphasis in original).

This Court has never held that a foreign forum selection clause that is untethered to a foreign proof-gathering restriction is a legitimate basis to deny a request for Section 1782 discovery. The district court found no "English 'prohibitions' on the use or acquisition" of the materials sought in this proceeding, and identified no principle of English law to justify invoking a forum selection agreement to restrict Banoka's ability to seek discovery in the United States for use in the English Proceeding. *See Martinez v. Bloomberg LP*, 740 F.3d 211, 224 (2d. Cir. 2014) ("questions about the meaning and scope of a forum selection clause—

are resolved under the substantive law designated in an otherwise valid contractual choice-of-law clause"); [SPA.56 (13:22-24)]. Respondents offered no authoritative proof to support a finding that Section 1782 discovery falls within the scope an English forum selection agreement.

The district court's forum selection clause analysis improperly substituted the district court's policy preferences over the long-standing policy announced by England's highest court. England's highest court abides by the "basic principle" that it is each litigant's individual responsibility to "prepar[e] and present[] [his case] in the High Court in England" and "obtain and present the evidence which he needs by his own means, provided always that such means are lawful in the country in which they are used." [A.255-256]; [SPA.55-56 (12:5-12)]; *see also Fed. Rep. of Nigeria*, 27 F.4th at 153, 155. In accordance with this policy "any party preparing his case in the High Court" is entitled "to obtain in a foreign country, by means lawful in that country, documentary evidence which they believe that they need in order to prepare and present their case." [A.256].

A plain reading of the English court's unqualified use of "any party preparing his case in the High Court" encompasses Banoka, and there is no dispute that Section 1782 is a lawful means to obtain discovery. Nothing from

Banoka's one-sentence forum selection agreement can be "properly understood" as embodying either a proof-gathering restriction or a policy against the use of Section 1782. The district court abused its discretion when it used Banoka's voluntary submission to the jurisdiction of the English courts as a basis to effectively create and impose a new English proof-gathering restriction on Banoka. *See Fed. Rep. of Nigeria*, 27 F.4th at 153.

Implicit in the district court's analysis is the impermissible creation of a two-tiered system where litigants who voluntarily submit to the jurisdiction of the English courts are vested with fewer tools "to prepare and present their case" than every other litigant with a matter before the English courts. [A.256]. The district court identified no sound policy reason grounded in the *Intel* factors to treat a forum selection agreement as an obstacle to restrict an English litigant's ability to seek Section 1782 discovery. If anything, the district court's emphasis on the forum selection clause with non-parties will disincentivize parties from agreeing to an English forum selection clause if doing so will impede the parties' future ability to "obtain…documentary evidence which they believe that they need in order to prepare and present their case." [A.256]; *see Fed. Rep. of Nigeria*, 27 F.4th at 155 (treating a bilateral assistance agreement as "an obstacle to a foreign sovereign seeking discovery pursuant to §1782 for use in criminal matters…would disincentivize the further proliferation" of similar agreements").

50

Moreover, the district court's finding that the forum selection clause between Banoka and Westmont was relevant because the English Proceeding will be against Westmont, misapprehends the scope and purpose of the forum selection clause. [SPA.55 (12:5-12)]. The forum selection clause governs the rights and obligations of Banoka and Westmont "arising out of or in relation to" Westmont's Offer Letter. [A.54]. The Application is directed at Elliott and A&M, not Westmont, and seeks relief solely from Elliott and A&M. Moreover, the forum selection clause evinces no intent to restrict Section 1782 discovery. That the Application, like all Section 1782 applications, seeks discovery in aid of a foreign proceeding, is an insufficient basis to hold that Banoka's forum selection agreement was a basis to deny Section 1782 discovery against the non-signatory Respondents.

The district court also erred when it relied on lower court decisions that cited a forum selection agreement as a basis to deny Section 1782 discovery. [SPA.54-56 (11:8-13:21) citing *In re DNG FZE*, 2024 WL 124694 (S.D.N.Y. Jan 11. 2024), *In re Saul Klein*, 2023 WL 8827847 (S.D.N.Y. Dec. 21, 2023), *In re Alghanim*, 2022 WL 1423088 (S.D.N.Y. May 5, 2022), *In re Kreke Immobilien KG*, 2013 WL 5966916 (S.D.N.Y. Nov. 6, 2013)]. Unlike the English courts, which while recognizing the "significantly different" procedures of the US and English courts, have expressly endorsed Section 1782 as consistent with English procedures, in the cases cited above the lower courts did not provide any indication that the respective

51

foreign jurisdictions have adopted a similarly expansive and receptive policy. [A.256 (an English litigant's use of Section 1782 has not "in any way departed from, or interfered with, the procedure of the English court")]; *see contra In re DNG*, 2024 WL 124694, *4 (denying request to use Section 1782 to conduct depositions in the United States as an "end-run around the Singapore High Court's procedure" that limits foreign depositions where necessary "as a matter of justice"); *In re Saul Klein*, 2023 WL 8827847, *12 (Brazilian forum selection clause weighed "only slightly" against authorizing Section 1782 discovery where the applicant sought the disclosure of their foreign adversaries financial records); *In re Alghanim*, 2022 WL 1423088, *4 (noting "the parties' agreement on the very limited scope of discovery permitted under Kuwaiti law and procedure"); *In re Kreke*, 2013 WL 5966916, *4 (adopting prior lower court decisions that Section 1782 prohibits extraterritorial discovery).

Also, in *In re del Valle Ruiz*, this Court joined the Eleventh Circuit to hold that "a district court is not categorically barred from allowing discovery under §1782 of evidence located abroad." 939 F.3d at 533. In doing so, this Court overruled prior inconsistent decisions, including *In re Kreke*. *Id.*, 532, n. 15.

The district court's reliance on *In re Saul Klein*, *In re Alghanim*, and *In re Kreke*, is particularly misplaced as those cases involved civil law jurisdictions (Brazil, Kuwait and Germany) where, unlike England, "the process of obtaining evidence…is normally conducted by a judicial officer rather than by private

attorneys." *Societe Nationale Industrielle Aeropatiale v. U.S. Dist. Court for Southern Dis. Of Iowa*, 482 U.S. 522, 543 (1987); *contra* [A.255-256 (in England the responsibility is for each litigant to "obtain and present the evidence which he needs by his own means, provided always that such means are lawful in the country in which they are used")].

The district court abused its discretion when it found that the mere existence of a forum selection clause, that does not govern Respondents, weighed against Banoka. [SPA.56 (13:14-21)]. By agreeing to English court jurisdiction in a lawsuit against non-party Westmont when the merits case is commenced, Banoka placed itself on equal footing with every other litigant appearing before the English courts, with the same rights recognized by the English courts "to obtain in a foreign country, by means lawful in that country, documentary evidence which they believe that they need in order to prepare and present their case." [A.256].

The district court impermissibly imposed its policy preferences and, in contravention of authoritative proof from the English courts, created a two-tiered system for English litigants seeking Section 1782 discovery—a restrictive regime for parties that voluntarily submit to the jurisdiction of the English courts and the permissive regime endorsed by the England's highest court for everyone else. [A.255-256 ("I cannot see why, since the Federal law of the United States authorizes an application" for Section 1782 discovery, "the making of such

53

application…should be regarded as being…an interference" with "the English court's control of its own process")]; *see also In re Malev*, 964 F.2d 97, 100 (2d Cir. 1992) ("we are not at liberty to second-guess the policy choices of our Congress").

### III.   The District Court Misapplied the Fourth *Intel* Factor

The fourth *Intel* factor asks whether the discovery sought is "unduly intrusive or burdensome." *Intel*, 542 U.S. at 265. A "district court evaluating a §1782 discovery request should assess whether the discovery sought is overbroad or unduly burdensome by applying the familiar standards of Rule 26 of the Federal Rules of Civil Procedure." *Mees*, 793 F.3d at 302. Moreover, "whatever misgivings [the district court] may have about the impact of its participation in the foreign litigation," should be resolved by "issuing a closely tailored discovery order rather than by simply denying relief outright." *Id*. The district court barred depositions outright, and the district court's severe restrictions reduced the scope of permissible document discovery to zero documents. [A.1122]. The district court's complete denial of discovery was an abuse of discretion. The underlying dispute concerns a €55 million transaction. Minimal document discovery from a finite period of time and limited depositions are not disproportional with the needs of the case.

The district court's fourth *Intel* factor analysis was premised on a fundamental misapprehension that the Elliott Funds were independently functioning entities. [SPA.63 (20:13-16)]. The district court ordered no discovery at all. Stating that it

would consider "issuing a closely tailored discovery order," the district court "den[ied] relief outright" by restricting Banoka's right to discovery to documents created, sent, or received by shell fund entities that have no employees, no ability to create documents, and possess no documents. [SPA.10 (10:21-11:9) ("The funds themselves do not have separate employees, don't create documents"); SPA.63 (20:13-21:15) ("petitioners may only seek documentary materials with respect to which [the Elliott Funds] are parties, or signatories, or direct participants"); A.1122]; *see Euromepa*, 51 F.3d at 1101. Indeed, Elliott has already confirmed that the district court's excessive scope restrictions returned no documents, which is unsurprising because the Elliott Funds are empty shells with no documents and do everything through the Elliot Advisor Entities and affiliated Elliott investment advisors. [A.1122].

Limiting discovery to the shell Elliot Fund entities that neither create nor receive documents, while excluding the Elliott Funds' affiliated agents and investment advisors that were exclusively responsible for the Elliott Funds' operations and investments from scope of discovery "was unreasonable, and therefore reversible." *see Heraeus, Kulzer, GmbH v. Biomet, Inc.*, 633 F.3d 591, 598 (7th Cir. 2011) (district court's order that "cut down [the petitioner's] request...to nothing...was unreasonable, and therefore reversible"); [SPA.10 (10:21-11:9); SPA.61-62 (18:19-19:4)].

55

The Elliott Funds are shell entities created to serve as the corporate vehicles through which other affiliated Elliott entities deploy capital. [A.831 (¶¶3-5)]. As Elliott admits, "[i]t's the advisors that are deciding how to invest these funds" on the Elliott Funds' behalf. [SPA.10 (10:21-11:9)]. This includes the Elliott Advisor Entities that have "served as investment advisor to the Elliott Funds[']" onshore and offshore investment operations and investments since, at least, January 1, 2020, and Elliott UK. [A.831 (¶¶3-5)].

Also, the district court's finding that the Elliott Funds "created" WNE Investor is unsupported by the record. [SPA.61 (18:4-6)]. It was error for the district court to conclude that shell entities with no employees and no capacity to send an email somehow "created" a multi-million-dollar investment vehicle to engage in a cross-border €55 million hotel acquisition. [SPA.10 (10:21-11:9)]. Targeted document and deposition discovery in the context of this large transaction is not overbroad or unduly burdensome.

The record demonstrates little, if any, separation between the Elliott Funds and their onshore and offshore investment advisors, including the Elliott Advisor Entities. The very fact that Elliott used its affiliated investment advisors to act as the funds' ultimate decision makers, and maintained a shared IT platform to allow the free exchange of documents among the affiliated Elliott entities, both in New York and abroad, further supports the conclusion that Elliott operates as a single

56

business group.  [SPA.13 (13:7-9) ("as a practical matter, the way the business works is the U.S. entities have access to…Elliott U.K.'s documents")]; [SPA.14 (14:6-7) ("the way [Elliott's] business works, the documents may be found in servers in both the U.K. and the U.S.")].  The public record confirms Elliott's integrated business operations.  For example, Jonathan Pollock is both the Co-Chief Executive Officer of Elliott Management, and an active Director of Elliott UK, and Paul Singer, Elliott Management's other Co-Chief Executive Officer, is the public face of Elliott International.[5]

The district court erred when it found that the "record does not show that [the Elliott Advisor Entities] were involved in the creation and operation of [WNE Investor] or that they had a direct relationship with Elliott U.K."  [SPA.61(18-19-25)].  While the district court focused its attention on Elliott UK's alleged role as investment advisor for the Elliott Funds [SPA.63 (20:5-21:6)], the record evidence demonstrates that the decision to invest in the CVH Transaction was not limited to the Elliot Funds, but rather was made by an Elliott "special committee" that evaluated "all investment[s]" under consideration  [A.107 ("whilst Elliott still have a mandate to invest today, all investments must go through a special committee")].  There is more than a reasonable basis to conclude that the "special committee" that

---

[5] https://www.elliottmgmt.com/who-we-are/jonathan-pollock/;  https://find-and-update.company-information.service.gov.uk/company/02989338/officers;https://www.sec.gov/Archives/edgar/data/937611/000101359424000482/xslForm13F_X02/primary_doc.xml

evaluated "all investment[s]" made by Elliott included Elliott Management's Chief Executive Officers who, as discussed above, share overlapping executive or director roles in Elliott Management, Elliott UK and Elliott International. *Id*. The district court abused its discretion when it resolved the merits of a disputed issue of fact as a primary basis to justify restricting the scope of discovery to the Elliot Fund shell entities Elliott admits cannot create, sign, send, or receive documents. [SPA.10 (10:21-23), A.1122].

The district court's misapprehension of the interconnected relationship among the affiliated Elliott entities motivated the court's purported "concern" that ordering the production of all documents under the Elliott Funds' possession, custody or control would "effectively collapse[] corporate separations" or "incentivize[] companies to maintain segregated computer systems." [SPA.64 (21:10-15)]. Elliott maintained no corporate separations. Elliott maintained a fully integrated business operation with a "special committee" through which "all investments," including the CVH Transaction, were processed for approval, and where Elliott's investment advisor affiliates acted as the Elliott Funds' agents, and the CEOs of Elliott Management oversaw and executed the operations of the Elliott Funds and Elliott UK. [SPA.10 (10:21-11:9); A.110]; *see supra* pp.56-57.

The district court also abused its discretion when it found that Banoka's requests implicated issues of extraterritorial discovery. [SPA.63-64 (20:22-21:6)].

58

The Elliott Funds are New York-based fund entities that Elliott used to invest in the CVH Transaction. Banoka seeks the production of documents related to the CVH Transaction. Documents and information created, received or sent by the Elliott Funds' agents and investment advisors on behalf of the Elliott Funds, and within the possession, custody or control of the Elliott Funds are properly within the scope of Section 1782 discovery. Once Elliott admitted that the Elliott Funds have the practical ability to obtain their investment advisors records the district court should have concluded that as to the Elliott Funds the fourth *Intel* factor was, at best, neutral. *See Mirlis v. Greer*, 80 F.4th 377, 382 (2d. Cir. 2023) ("'Control' does not require 'actual physical possession of the document at issue; rather documents are considered to be under a party's control when that party has the right, authority, or practical ability to obtain the documents…."); [SPA.13 (13:7-9); SPA.14 (14:6-7)].

Even if Banoka's request for electronically stored information implicated extraterritorial discovery, Section 1782 "authorize[s] extraterritorial discovery." *See In re del Valle Ruiz*, 939 F.3d at 533 (the "text of §1782 authorizes discovery pursuant to the Federal Rules of Civil Procedure," and the rules "authorize extraterritorial discovery so long as the documents to be produced are within the subpoenaed party's possession, custody, or control…§1782 likewise allows extraterritorial discovery"); *citing Sergeeva v. Tripleton Int'l Ltd.*, 834 F.3d 1194, 1200 (11th Cir. 2016) ("the location of responsive documents and electronically

stored information—to the extent a physical location can be discerned in this digital age—does not establish a *per se* bar to discovery under §1782"). Moreover, where, as here, Elliott concedes the interconnected relationship among the affiliated Elliott entities, the district court abused its discretion and misapprehended the law when it limited discovery to shell entities that admittedly have no documents, no ability to create or send documents, and no capacity to take any actions.

The district court abused its discretion to exclude documents under the Elliott Funds' possession, custody and control from the scope of discovery merely because Elliott has intentionally structured its business operations to vest the operational control of the Elliott Funds with the affiliated Elliott investment advisors. *See Sergeeva.*, 834 F.3d at 1199-1200 ("control" for purposes of Section 1782 discovery may be established by showing that "affiliated corporate entities…have actually shared responsive information and documents in the normal course of their business dealings"). The district court's unjustified concerns of burden should not confine the scope of discovery to documents created by the shell Elliot Fund entities that admit they have no such documents. [SPA.63 (20:13-21:6)]. The district court's scope ruling improperly bars all discovery.

The district court's generic "concerns" of "forum shopping" and "proof-gathering restrictions" fail to support the court's extraordinary scope restrictions that reduced the scope of discovery to zero documents. [SPA.64 (21:1-6); A.1122]

60

Moreover, the district court's reliance on Banoka's forum selection agreement was error and nowhere in the Order does the district court identify any "proof-gathering restrictions." *See In re del Valle Ruiz*, 939 F.3d at 534 (affirming grant of Section 1782 discovery where there was "no evidence that the foreign proceeding would be unreceptive to the evidence," "no argument…that Petitioners are attempting to procure documents…in contravention of restrictions in place in the foreign proceedings," and respondents have not "made any showing that the production of any responsive documents would be unduly intrusive or burdensome").

## <u>CONCLUSION</u>

The Court should reverse the district court's order and direct the district court to compel all Elliott Respondents to respond to and comply with the subpoenas included with Banoka's Application under Section 1782, including by producing non-privileged responsive documents and sitting for depositions.

Dated: August 30, 2024
     New York, New York

61

MEISTER SEELIG & FEIN PLLC

By: /s/ Alexander D. Pencu
     Alexander D. Pencu, Esq.
     Christopher J. Major, Esq.
     Austin D. Kim, Esq.
     125 Park Avenue, 7th Floor
     New York, NY 10017
     (212) 655-3500
     adp@msf-law.com
     cjm@msf-law.com
     adk@msf-law.com

     *Attorneys for Appellants*
     *Banoka S.à.r.l., ATYS S.A.,*
     *Renato Picciotto, Jacques*
     *Champy and Jean Bissonnet*

## <u>CERTIFICATE OF COMPLIANCE</u>

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B)(i), and the word limit of Fed. R. App. P. 32(a)(7)(A), because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 13,720 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word with 14 characters per inch and Times New Roman.

Dated: August 30, 2024
     New York, New York

MEISTER SEELIG & FEIN PLLC

By: /s/ Alexander D. Pencu
Alexander D. Pencu, Esq.
Christopher J. Major, Esq.
Austin D. Kim, Esq.
125 Park Avenue, 7th Floor
New York, NY 10017
(212) 655-3500
adp@msf-law.com
cjm@msf-law.com
adk@msf-law.com

*Attorneys for Appellants Banoka S.à.r.l., ATYS S.A., Renato Picciotto, Jacques Champy and Jean Bissonnet*

# SPECIAL APPENDIX

i

## TABLE OF CONTENTS

**Page**

Transcript of Proceedings before the Honorable
Gregory H. Woods, dated April 10, 2024 .............. SPA-1

Transcript of Proceedings before the Honorable
Gregory H. Woods, dated April 11, 2024 .............. SPA-44

Order of the Honorable Gregory H. Woods, dated
April 16, 2024 ....................................................... SPA-68

SPA-1

1

O4AABanC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   BANOKA S.a.r.l., *et al.,*

4                   Petitioner,

5           v.                          22 Civ. 0182 (GHW)(KHP)

6   ALVAREZ & MARSAL, INC., *et*
    *al.,*
7                                       Telephone Conference

8               Defendant.

9   ------------------------------x
                                        New York, N.Y.
10                                      April 10, 2024
                                        3:04 p.m.
11
    Before:
12
                    HON. GREGORY H. WOODS,
13
                                        District Judge
14
                        APPEARANCES
15
    MEISTER SEELIG & FEIN LLP
16        Attorneys for Plaintiff
    BY:   AUSTIN D. KIM
17        CHRISTOPHER MAJOR

18  AKIN GUMP STRAUSS HAUER & FELD LLP (NYC)
          Attorneys for Defendant Elliott
19  BY:   JAMES E. TYSSE

20
    OLSHAN FROME WOLOSKY LLP
21        Attorneys for Defendant A & M
    BY:   KERRIN KLEIN
22

23

24

25

SPA-2

O4AABanC

1      THE COURT:  So let's begin.  So what I'm going to do

2    is begin by taking appearances from the parties.  I'm going to

3    start with counsel for petitioner, then I will hear from each

4    of the respondents.  I will warn you in advance that I may call

5    petitioner plaintiff and may call respondents defendants, so

6    please understand that I'll be using those terms potentially

7    interchangeably during this conference.

8         So, first, who's on the line for petitioner?

9      MR. KIM:  Good afternoon, your Honor.  Austin Kim from

10    Meister Seelig & Fein for the petitioner.  I have with me my

11    colleague Christopher Major.

12         THE COURT:  Thank you.  And who's on the line for the

13    Alvarez & Marsal entities?

14      MS. KLEIN:  Good afternoon, your Honor.  This is Karen

15    Klein from Olshan Frome Wolosky LLP on behalf of the A & M

16    respondents.

17         THE COURT:  Thank you.  And who's on the line on

18    behalf of the Elliott respondents?

19      MR. TYSSE:  Good afternoon, your Honor.  This is James

20    Tysse of Akin appearing on behalf of the Elliott respondents.

21         THE COURT:  Good.  Thank you.  So just a few brief

22    instructions about the rules that I would like to ask the

23    parties to follow during this conference before we begin with

24    the substance of the conference itself.

25         The first thing that I want to do is just to remind

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SPA-3

3

O4AABanC

1    you that this is a public proceeding.  Any member of the public

2    or press is welcome to dial into this conference.  I'm not

3    presently monitoring whether they are, but they're welcome to

4    do so.  So I just ask you to please keep that possibility in

5    mind.

6            Second, please state your name each time that you

7    speak during this conference.  You should do that even if you

8    have spoken previously.  I am not going to do that because I

9    expect that the court reporter knows what I sound like, but it

10   will be helpful for the record if each of you states your name

11   please as you begin your remarks.

12           Third, please keep your lines on mute at all times

13   except when you are intentionally speaking to me or to the

14   representative of another party.

15           Fourth, please abide by instructions from our court

16   reporter that are designed to help the court reporter do her

17   job.

18           And, finally, I'm ordering that there be no recording

19   or rebroadcast of all or any portion of today's conference.

20           So, counsel, with all of that out of the way, thanks

21   for joining today's proceeding.  I wanted to convene the

22   parties to the extent that there are any arguments that you

23   want to present that would supplement the arguments presented

24   with respect to the discretionary factors for the analysis of

25   this petition under 1782.  As I indicated in my March 22

SPA-4

4

O4AABanC

1  opinion, those factors were not reached by the magistrate judge

2  request in her analysis of the case.  Rather than sending it

3  back to her for resolution, I'm inclined to resolve that part

4  of the application myself.

5          I've reviewed your respective submissions, including

6  the recent letter with citation to assertively supporting

7  authority, and I think I have a view regarding the issues

8  presented here.  With that said, if either side wants to add

9  something to your respective written submissions, I'll give you

10  the opportunity to do so.  I think I have very small number of

11  questions, very small number of questions for the parties, and

12  then I hope to be in a position to resolve the application.

13          So let me start first with counsel for petitioner.

14  Counsel, is there anything that you would like to add to your

15  written submissions?

16          MR. KIM:  Thank you, your Honor.  Austin Kim for the

17  petitioners.  Yes.  I'll start with the most recent submission

18  from the Elliott respondents, and the overall point that I

19  believe the Court should know is that the respondent in this

20  1782 proceeding are not the targets of the English proceeding,

21  will not be named in any English proceeding.  And I believe

22  that the Elliott respondents had indicated that they believed

23  that their U.K. affiliate in the "presumptive defendant",

24  that's just not true.  There's nothing in the record to

25  indicate that.  All of the submissions that we have made here

SPA-5

5

O4AABanC

1    and the pre-action letters exchanged in England are targeted at

2    one entity.  That's Westmont.

3         And so to the extent that the respondents are relying

4    on the potential prospect that they believe that they may be

5    targeted in England, we will rest on our papers to emphasize

6    the fact that they are not.  And I'll make representation on

7    the record before the Court today that the only target of the

8    English proceeding is Westmont.  And so I think that addresses

9    the *Frasers Group* case, and the points raised in the Elliott

10   respondent's letter.

11        THE COURT:  Thank you.  So, counsel, I'm not going to

12   take a position now regarding what the appropriate outcome is

13   in my application of the discretionary factors, but I do want

14   to just solicit your views regarding the arguments related to

15   the asserted overbreadth of the subpoenas.  I have two

16   questions.

17        One, is the scope of the application for discovery

18   here the must have move to narrow the scope of the requests

19   that were made and that you have made?  And two, why should the

20   respondents bear the cost of responding to these inquiries

21   should I grant your request?

22        MR. KIM:  We certainly aren't tied to our request.  We

23   would be more than happy to engage in a meet and confer with

24   the respondents to the extent that they come back and say they

25   ran through the search terms and it came back with an inornate

SPA-6

6

O4AABanC

1   number of hits because either false positives or something like

2   that.  Would definitely be amenable to narrowing the scope and

3   making it more targeted.  To the extent there's specific

4   requests in general that the Court deemed overbroad, we would

5   certainly confirm the Court to prune them as appropriate.

6           As for the costs, I believe that it would be incumbent

7   on the respondents to present some basis to the Court that are

8   excessive -- that there is an excessive burden.  I'm not sure

9   if the respondents, since the last hearing before Magistrate

10  Judge Parker, have engaged in some document pulling to see if

11  the hit counts or the volume is such that it would be quite

12  expensive.  I just don't think that's the case.

13          This is a request for documents and information

14  related to one transaction over a nine-month period.  So I

15  wouldn't expect there to be a significant number of responsive

16  documents here.  And for that basis I would say that we

17  shouldn't have to bear the cost.  But again, if the respondents

18  come back and say it's going to cost, you know, X amount of

19  money and it turns out to be an excessive burden, then I'll

20  also leave that to the Court's discretion.

21          THE COURT:  Good.  Thank you.  Let me hear from each

22  of the petitioners in turn.  First counsel for the A & M

23  respondents.

24          MS. KLEIN:  Thank you, your Honor.  Kerrin Klein for

25  the A & M respondents.  I think a lot of this is set forth in

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SPA-7

7

O4AABanC

1    our papers and I don't need to repeat what's in there.  I did

2    just really want to emphasize one fact in particular here,

3    which is that the entity, the A & M entity, that has the

4    relevant witnesses, custodians, and documents is a French

5    entity, Alvarez and Marsal France SAS.  That entity's direct

6    corporate parent is located in the U.K. and the corporate

7    parent of that corporate parent is one of the respondents here.

8    The other two A & M respondents are more indirectly affiliated

9    through that corporate parent of the corporate parent.

10           It's very clear based on what petitioner has alleged,

11    that they would be unlikely to be able to attain any documents

12    against A & M, any A & M entity in the U.K.  They haven't

13    sought discovery from the A & M entities in the U.K. or in

14    France.  And under U.K. law, it is clear that only in very

15    limited circumstances that they haven't alleged here can a

16    party seek pre-suit discovery from a nontarget, which is what

17    they've alleged A & M to be.

18           So I think based on that it's very clear that what

19    they're seeking to do is to get around the restrictions in the

20    U.K. by not going to a U.K. court to seek discovery of the

21    direct parent or a French court to seek discovery of the

22    relevant entity, but instead going layers farther removed

23    against much more indirectly affiliated A & M entities that

24    have no ties to the transaction at issue.

25           THE COURT:  Good.  Thank you.  Counsel for the Elliott

SPA-8

8

O4AABanC

1   respondents?

2           MR. TYSSE:  Good afternoon, your Honor.  This is James

3   Tysse on behalf of the Elliott respondents.

4           Your Honor, I think this is far from a typical 1782

5   petition that seeks U.S. discovery for use in a foreign

6   proceeding.  Instead, we view this as petitioner seeking

7   foreign discovery for use in a foreign proceeding.

8           As Judge Barker found in footnote three of her report

9   and recommendation, petitioners have identified no specific

10  documents or witnesses actually located in the U.S. such that

11  it appears that these respondents who are in the U.S. are

12  targeted "solely because of their presence in the U.S., not

13  because of their direct involvement in or knowledge of the

14  transaction at issue."  And so I think that, you know, we would

15  urge the Court to find in its discretion that this is not a

16  proper use of Section 1782 for reasons I would love to be able

17  to expand upon.

18          Unfortunately that I just briefly mentioned that it

19  sounds like you don't want further briefing, which is obviously

20  within your discretion.  If you were amenable to it, we do

21  think it would be appropriate here for a couple reasons.

22  First, because petitioners after having failed to raise the

23  discretionary factors in their objection, we covered those

24  topics only briefly and had no opportunity to respond to the

25  arguments that they raised for the first time in their reply.

SPA-9

9

O4AABanC

1   And also, it's been a year and a half or so, 20 months I

2   believe, since the petitioners filed their petition, and there

3   have been a number of relevant developments since then

4   including several Second Circuit district court decisions

5   including the *Frasers Group* case, but as well as hearings

6   before Judge Parker and decisions from Judge Parker and of

7   course your Honor.

8           Having said that, I'm also happy to discuss some of

9   those issues today if you'll afford me the time.  And we do

10  think this is a case where, again, it's not a typical Section

11  1782 action.  In fact, they're really seeking documents from

12  all intents and purpose their foreign adversary and I think the

13  best --

14          THE COURT:  Let me -- and I'm happy to give you the

15  chance to preview what the arguments --

16          MR. TYSSE:  Sure.

17          THE COURT:  -- or tell me what those arguments are.

18  I'm not inclined to additional briefing, but after hearing from

19  you I may revisit that.

20          But the one principal thing that I would like to hear

21  from you, counsel, as you make any remarks that you wish to the

22  Court relates to the participation of Elliott Associates LP and

23  Elliott International LP.  Because as I understand it from the

24  submissions, those two entities created an investment vehicle

25  with Westmont, which is WNE Investor S.a.r.l.  It's that fact

SPA-10

10

O4AABanC

1   that I wanted to hear you expound upon given the briefing and

2   in your comment now that these U.S. entities weren't directly

3   involved in the transaction given their involvement in the

4   development of that investment vehicle.  I want to hear more

5   from you about the basis for that position.  But I'll open the

6   floor to you, counsel for Elliott.  Go ahead.

7         MR. TYSSE:  Thank you very much, your Honor.  James

8   Tysse again.

9         Yes, so I think it's important to walk through a

10  little bit the relationship between these entities because I

11  think there's been some confusion in the briefing on this point

12  including from my friends on the other side.

13        To be clear, Elliott was involved in the transaction

14  in question.  But the way that the firm is structured is that

15  the firm has two funds, which are the two funds you mentioned,

16  Elliott Associates and Elliott International, and then it has

17  investment advisors, both on shore and offshore, serving in one

18  respect Elliott Associates, and then in the case of Elliott

19  U.K., the U.K. advisor that serves the funds from the

20  international perspective.

21        The funds themselves do not have separate employees,

22  don't create documents.  It's the advisors that are deciding

23  how to invest these funds.  And once they make a

24  recommendation, the funds will then commit money to an

25  investment.  So in that respect, Elliott respondents are

SPA-11

O4AABanC

1     involved in this because the two entities you mentioned,

2     Elliott Associates and Elliott International, are majority

3     owners of the joint investment vehicle with Westmont that would

4     have eventually funded the transaction had they been able to

5     complete the transaction.  But Elliott U.K. was the actual,

6     let's say, you know, operative party, the one that was advising

7     on the ground, working with Westmont, and ultimately deciding

8     whether to commit the funds from Westmont -- I'm sorry, WNE

9     Investor S.a.r.l.

10            So it's quite confusing.  You did name the relevant

11    entity, which is the, you know, investment joint venture that

12    would have funded this, and that is the relationship to Elliott

13    U.S.  But I guess where I'm getting with all of this is that --

14    and if that's not clear, please follow up because I do want to

15    make sure it is clear.

16            THE COURT:  Thank you.  Let me just ask a follow-up

17    question.  I understand the argument to be that Elliott U.K.

18    would have more information, but does the fact that Elliott LP

19    and Elliott International LP would have less result in them not

20    being subject to a request for the information that they do

21    have?  So understanding that U.K., the advisor, as you proffer

22    would have more information as the direct advisor, is your

23    argument that because these two U.S. based entities would have

24    less information, that information cannot be sought in the U.S.

25    pursuant to 1782?

SPA-12

12

O4AABanC

1        MR. TYSSE:  I don't think it's a question of more

2     versus less.  I think it's a question of some versus none.  The

3     Elliott U.K. advisors were the ones involved in the transaction

4     and from what my -- what I understand from my client, either

5     all or very close to all, 99 percent of the communications that

6     are sought from the Elliott entities are in the possession,

7     custody, and control of that Elliott U.K. entity.

8        THE COURT:  Understood.  Let me ask the same question.

9     So it is some, but not all.  If those two U.S. entities have in

10    their possession, custody, or control a small amount of

11    responsive information, does that weigh in favor of me denying

12    the request, or does it favor me granting the request and you

13    producing a limited universe of documents?

14       MR. TYSSE:  Well, your Honor, you know, I think that

15    would be a second best option for us if you were to say -- and

16    I think it would be well within your discretion under Section

17    1782 of plain text, which allows you to prescribe the manner in

18    which discovery is granted, to say essentially Elliott

19    respondents you have to comply with the subpoena, but only with

20    respect to those documents that are created by you that you are

21    the primary custodians of, and not those documents that Elliott

22    U.K. has in its possession and whatnot.  The problem is -- and

23    I think that would solve some of the problem.  I don't think it

24    would get around some of the other issues that I think we

25    identified in our briefing and I would be happy to speak about

SPA-13

13

O4AABanC

1   today, including trying to sort of evade the forum selection

2   clause and the forum proof gathering restrictions that are

3   relevant to this dispute.

4        I guess I would urge the Court that if it were to do

5   that though, it would restrict it to documents that were

6   actually again created or primarily in -- the primary

7   custodians being those U.S. entities.  Because as a practical

8   matter, the way the business works is the U.S. entities have

9   access to Westmont, or excuse me, Elliott U.K.'s documents.  So

10  if you were to say it's only documents in the custody or

11  possession of the domestic entities, that would require them to

12  turn over all of the U.K. entities' documents as well, which is

13  why, again, unless it was very narrowly crafted, I don't think

14  it will solve the concern we have, which is really that they're

15  seeking foreign documents for use in a foreign proceeding.

16  They're not seeking the Elliott respondent's U.S. documents for

17  use in a foreign proceeding, which would be a classic and

18  typical and proper, in our view, use of Section 1782.

19        THE COURT:  I want to make one other thing clear.  So

20  your concern is with the standard language, possession, custody

21  or control as the funds you say, that they, the funds.  Do I

22  understand correctly that they, the funds, have some control

23  over the I'll call it information that they have?  So the issue

24  is control as opposed to custody and possession?

25        MR. TYSSE:  You know, it could be all three, your

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SPA-14

14

O4AABanC

1    Honor.  I don't want to misstate where the documents are
2    actually located.  Again these documents were created in the
3    custodian of the documents.  And indeed the subpoena asks for a
4    custodial witness to provide testimony.  That custodian would
5    be from the U.K. given where the documents were created and
6    originally stored.  But just the way the business works, the
7    documents may be found in servers in both the U.K. and the U.S.
8     The issue that I think we have and the issue that poses the
9    greatest problem for us in our view and the reason why you
10   should exercise your discretion to deny the discovery is
11   they're not actually seeking documents that are the Elliott
12   respondents in any sense.  They're seeking documents that are
13   by right Elliott U.K.'s but they're using this procedure to
14   evade both their forum selection clause as well as U.K.
15   discovery rules to go after entities solely, as Judge Parker
16   noted, because they are located here, not because they had any
17   involvement in this.
18           That seems like plain circumvention under a number of
19   cases in this court, including *Frasers Group* recently, but also
20   cases like the *Kiobel* case from a few years ago.
21           THE COURT:  Thank you.  So let me just stop you on
22   that.  The issue with the argument is that the contention that
23   they don't have any involvement in this given the fact that
24   those two funds created a joint investment vehicle with
25   Westmont as I understand it.  So it's not clear to me whether,

SPA-15

O4AABanC

1   you can tell me, if you can sign an affidavit stating that

2   either of these two entities were involved in this.  You

3   haven't given me that up to this point very studiously, and

4   it's not clear to me that that is a representation that can be

5   made.  In other words, that those two entities were not

6   involved in the transaction.

7          So that I think is the point that I'm trying to

8   highlight and understand if that is true, namely if those two

9   entities were involved, albeit under the guidance of their U.K.

10  based affiliates, why shouldn't some portion of the documents

11  that they have -- are responsible for say, using broad terms,

12  be subject to 1782 discovery, because they are U.S. entities

13  who were allegedly involved in the creation of that entity?

14  Counsel, go ahead.

15          MR. TYSSE:  Understood.  Thank you, your Honor.  James

16  Tysse.

17          I understand your question.  And, again, I don't mean

18  to be cute or deny that those two entities are involved in a

19  very high-level sense, in that again, they're the majority

20  owners of this potential investment vehicle.  What I'm

21  suggesting is that the -- that the way that the company is

22  structured is that the U.S. based advisors advise on U.S.

23  deals.  The U.K. advisors advise on U.K. deals, and it never

24  got to the point where the funding would have had to have been

25  made.  And accordingly, you know, we just don't consider them

SPA-16

16

O4AABanC

1    involved in the sense that I think, you know, is relevant to

2    three purposes in the sense of are there documents that these

3    entities created or that are responsible for I should put it,

4    e-mails sent, you know, pitch techs made, those sorts of

5    things.  All of that is on the side of Elliott U.K.

6            To the extent there are a limited universe of

7    documents, I don't believe they exist, but to the extent there

8    are limited universal documents that involve those two Elliott

9    respondents in particular, then I don't think we would object

10   in the circumstance for those documents being turned over.

11   Again, as long as the discovery restriction was limited to

12   those sorts of documents and not an attempt to evade what the

13   forum proof gathering restrictions.

14           And I will say, I say we wouldn't object.  As a

15   secondary option, I think our primary objection still though is

16   they agreed to litigate this dispute primarily, or excuse me,

17   exclusively in the Courts of the U.K., and accordingly

18   regardless of where they are located, they are essentially

19   seeking to move this dispute to U.S. courts notwithstanding

20   that commitment.

21           THE COURT:  Thank you.  I apologize for detouring you.

22   Go ahead if you have more to provide.  Any other information

23   that you would like to share?

24           MR. TYSSE:  Well, I certainly want to be responsive to

25   your particular concerns, your Honor.  So if you have any other

SPA-17

17

O4AABanC

1   questions, please feel free to interrupt.  I will note though

2   on page 24 of the petitioner's Section 1782 position, they

3   squarely state that it is possible that the discovery

4   petitioners seek from the A & M respondents and Elliott

5   respondents may also be in the possession, custody, or control

6   of Westmont.  In other words, they acknowledge given the

7   relationships between these parties that they can likely, or at

8   least it's possible, that these documents are available through

9   ordinary U.K. procedures.  And the fact that -- I think they

10  say that although that's true, there's no exhaustion

11  requirement.  But I think the *Frasers Group* case makes clear

12  that in the exercise of your Honor's discretion, you can find

13  that if this dispute is primarily a dispute in which the

14  parties have agreed to litigate their differences in a

15  particular court in the U.K., and especially in the

16  circumstance where it was clearly foreseeable for petitioners

17  to find that not only Westmont itself, but Westmont's

18  coinvestors might want to invoke this forum selection clause,

19  that should weigh in favor of saying that the sophisticated

20  entity, petitioners here, should be held to their bargain and

21  not be able to essentially forum shop by choosing a different

22  country's rules for discovery other than the one that they

23  bargained for.

24          THE COURT:  Can I just ask you.  I'm sorry.  I

25  apologize for interrupting.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SPA-18

18

O4AABanC

1    MR. TYSSE:  Sure.

2    THE COURT:  Can I just ask you to follow up on that.

3    So let me accept for this purpose that the existence, for

4    argument purpose, that the forum selection clause A factor to

5    be considered in balancing the more discretionary factors, is

6    it a dispositive factor?

7    MR. TYSSE:  No, your Honor.  I think it's one of the

8    discretionary factors that this Court should analyze.  And I

9    think that factor, along with several of the others, the fact

10   that they are, again, for all intents and purposes seeking to

11   obtain documents from their foreign adversaries or their

12   foreign adversaries' coinvestor, for example, and other factors

13   all point in the same direction.

14       At the end of the day, again, this is a dispute taking

15   place in England involving English documents.  The locus of the

16   dispute is in England.  The parties agree to litigate in

17   England.  And they have been trying to seek documents outside

18   of that forum for the past several years, which is our primary

19   objection.  It is simply they're seeking to get around the

20   requirements they bargained for.

21       And on this point I would urge you to review Chief

22   Judge Swain's 2022 decision.  It's unpublished, *In re Alghanim*.

23   I don't know how to pronounce it.  A-L-G-H-A-N-I-M.  It's 2022

24   WL 1423088, and I think what that case makes clear is that this

25   factor weighs in respondent's favor.  And by this factor, I

SPA-19

O4AABanC

1    mean the factor three, Intel factor three, when there is a

2    forum selection clause that sophisticated parties have entered

3    into, and it weighs in party's favor notwithstanding the fact

4    that the target of discovery in the U.S. is not actually

5    signatory to that clause.  And I think Chief Judge Swain cited

6    a number of cases, but I think his reasoning persuasive.  He

7    says essentially because the sophisticated parties already

8    assented to foreign authority by signing this forum selection

9    clause, they also agree to that foreign forums discovery rules.

10   And in trying to circumvent those discovery restrictions, they

11   are engaging what amounts to forum shopping, which does not

12   further the aims of Section 1782.  And there's a number of

13   cases cited therein.

14          And as I think he recognized, there's just no

15   unfairness in requiring the petitioners here who agreed to

16   litigate all of their disputes in England to pursue the

17   discovery policies there, rather than trying to use perhaps

18   more liberal foreign discovery, when again, the parties at the

19   outset of this decided that that is not what they wanted to do,

20   that was not their preference.

21          I think it violates other proof gathering restrictions

22   too.

23          THE COURT:  Can I ask one quick question about this?

24          MR. TYSSE:  Sure.

25          THE COURT:  Again, for argument purposes.  As I

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SPA-20

20

O4AABanC

1   understand it, Elliott is not -- no Elliott entity is a party

2   to the agreement with the forum selection clause.  How does

3   that affect the analysis here?  In other words, to what extent

4   does the agreement between the other parties weigh in your

5   favor here given your client is not party to the contract with

6   the forum selection clause?

7           MR. TYSSE:  Thank you, your Honor.  James Tysse again.

8           I think it relates in two ways.  I think in one sense

9   we can and I think should be able to simply invoke the clause

10  given the parties' allegations of the close relationship.  I

11  think the Second Circuit's *Magi* decision, M-A-G-I, 714 F.3d 714

12  makes this clear.  I think that talks about a case where a

13  non-signatory was allowed to actually invoke a forum selection

14  clause in the agreement it did not sign.  And what the case

15  says among other things was that "where the alleged conduct of

16  the nonparties is closely related to the contractual

17  relationship, a range of transaction participants, parties and

18  nonparties, should benefit from and be subject to forum

19  selection clauses."

20          And I think that pretty aptly describes what's going

21  on here.  Even though the Elliott respondents were not in fact

22  the signatories, they were certainly the transaction

23  participants.  They were well-known to the petitioners in this

24  case.  So it's certainly foreseeable and there seems to be no

25  unfairness in requiring the forum selection clause to remain

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SPA-21

21

O4AABanC

1    enforceable even in this context.

2         On that point, I think petitioners clearly allege in

3    pages 18 and 21 of their petition that respondents -- were

4    aware of the Elliott respondents.  They talked about the

5    integral roles Elliott respondents played and they served in

6    the transaction as Westmont's contemplated coinvestors.

7         So that's one point, but the other point I would make,

8    your Honor, is even if you found that standing, and again, I

9    think we have a good argument especially under the kind of

10   discretionary role you play here that they do, I think more

11   importantly it's just not required that they even have standing

12   to invoke it.  Again, in the *In re Alghanim* case that Chief

13   Judge Swain decided, that was also non-signatory to the forum

14   selection cause.  And yet, the Court still found that that

15   factor weighed in favor of denying discovery in that case given

16   what essentially amounted to circumvention.

17        THE COURT:  Good.  Thank you.  Please proceed.

18        MR. TYSSE:  Okay.  Thank you.  We talked a lot about

19   the third factor and mostly about the forum selection clause.

20   I just want to make two other quick points about that.

21        First, the question not only whether it violates forum

22   proof -- excuse me, forum proof gathering restrictions with

23   respect to forum selection clauses, but more broadly, I

24   mentioned the *Kiobel* case already, 895 F.3d 238, and in that

25   case the Second Circuit found that the District Court abused

SPA-22

22

O4AABanC

1     its discretion by allowing discovery under the third Intel

2     factor where a party was trying to circumvent Netherlands' law

3     restrictive discovery practices, which is why "they were

4     seeking to gather discovery from the party's lawyer in the

5     U.S., rather than from the party in an ongoing proceeding in

6     Denmark."

7            So I think that's an example.  The reason there I

8     think is helpful, it shows again at least in a circumstance

9     here where they're suing closely related parties, you know,

10    coinvestors.  If you're taking petitioners at their word that

11    the Westmont is closely related to the Elliott respondents they

12    sued, they said they played an integral role in the transaction

13    and that they were, you know, important players in that in the

14    language I just read a moment ago that they played an integral

15    role in the transaction as a coinvestor.

16           I think that at least in that circumstance where there

17    is that close relationship, they can't evade ordinary

18    disclosure restrictions in the forum that they agreed to.  But

19    that's what they're trying to do here.  As the Southern

20    District of Texas recognized, their petitioners were hoping to

21    obtain in this court what they feared the English court would

22    deny them, and that's not a proper use of Section 1782.

23           And one other small point, too, this is a question

24    about pre-suit discovery as your Honor knows.  They have not

25    yet filed suit.  So they're actually seeking something that

SPA-23

23

O4AABanC

1    they can't even get in the United States, which is a discovery

2    order about a suit they have yet to file. Even in the United

3    States, if you want to plead a fraud claim, you actually have

4    to do so with particularity. You can't go to court and get

5    information to decide whether or not to bring the suit. So I

6    think, again, in terms of exercising your discretion, I think

7    it's useful to think about whether or not this violates perhaps

8    not even the U.K. policies about discovery, but the U.S. ones

9    as well.

10          Turning to factor one, we've also talked about this

11    one a bit too. This one is also a bit tricky to apply before

12    the petitioners have actually filed suit. I heard my friend on

13    the other side today say how Elliott respondents are not

14    targets, and that Elliott U.K. is not a target either. I think

15    that is helpful to hear, but it is I suppose small comfort. I

16    would assume that if we were to turn over documents that

17    suggested to them that there was some fraud, that they would,

18    you know, want to sue anybody that committed fraud against

19    them. So I'm not sure sort of statements like that, absent a

20    clear stipulation which I'm not sure I heard, would be helpful.

21    And on that point, I'll note that before the magistrate judge,

22    the magistrate judge specifically asked petitioners whether

23    they would stipulate not to sue the Elliott respondents and

24    they declined to do so. Maybe they've changed their tune since

25    then. I couldn't quite understand whether that was a pure

SPA-24

24

O4AABanC

1    stipulation or whether that was simply saying they're not

2    targets currently.

3         But again, I think that's small comfort for our

4    defendants who are going to have to be turning over documents

5    that may very well give them the tools to sue them in a few

6    months if they decide that gives them sufficient proof of

7    fraud.  But either way, as I mentioned before, I just do think

8    that relationship is quite close.  And that's true whether you

9    look at it now against only Westmont.  Again, my clients are

10   the potential coinvestors through WNE Investor S.a.r.l. with

11   the undisputed target.  And so that seems to be a close

12   relationship to me, particularly when again they admit that the

13   discovery petitioners seek may well be in the possession of

14   Westmont already.  And but they also may sue Elliott U.K. or

15   even--

16        THE COURT:  I'm sorry.  I apologize.  Will you

17   remember the thread if I interrupt you here?

18        MR. TYSSE:  Yes, of course.

19        THE COURT:  Thank you.  If you want to take a note of

20   where you were, please take a moment to do that.  I apologize

21   for interrupting.

22        My understanding is the nature of the investment, the

23   co-investment, was as a financing source.  Can you tell me what

24   the nature of the co-investment contemplated was?  Was it a run

25   or equity investment or something different?

25

O4AABanC

1      MR. TYSSE:  Your Honor, I don't think I have that
2   information handy and I don't want to misspeak.  I can follow
3   up with you if it would be helpful to your decision.
4      THE COURT:  That's fine.  It just would not be I think
5   very material.  It just would have been helpful to know to help
6   evaluate your concern about the likelihood of your clients
7   being brought into the fraud claim, but that's a very ancillary
8   consideration.  Go ahead.  I apologize for derailing you.
9      MR. TYSSE:  No problem.  James Tysse again.  And
10  again, please don't apologize for interrupting.  I want to be
11  able to answer your questions to the best of my ability.
12      But I guess just to play off a little bit of the
13  question you just asked, I mean, part of the concern again is
14  that their accusations relate to things like -- a fraud relate
15  to things like whether or not the diligence concerns that were
16  raised by either my clients or the A & M respondents were
17  legitimate or not or they were just an excuse or trumped up.
18  Or things like whether or not they seriously intended to invest
19  or rather were stringing them along to sue them at a lower
20  price.
21      So again, they say now very clearly over and over
22  again that Westmont is their target.  But again, I think it's
23  small, cold comfort to the extent that again they're asking for
24  our documents.  If we turn something over they think is
25  suspicious, I just don't see why that would prevent them then

SPA-26

26

O4AABanC

1    from suing our defendants.  Which I think, you know, brings us

2    back to a little bit about why this is an awkward posture in

3    this pre-suit posture.  Of course, once they had actually sued

4    us we would know exactly who the defendants are, or at least at

5    that stage of the case and have a better sense of who their

6    true targets were.  But unfortunately now we have to play a bit

7    of a guessing game to figure out who they might eventually sue

8    once they get the discovery that tells them whether or not they

9    have a claim going forward.

10    THE COURT:  Thank you.  And just briefly, and I am

11    going to apologize again.  I appreciate the concern, but isn't

12    it at least arguable that when higher courts than I announce

13    the reasonable contemplation standards that this is just part

14    of that in announcing a test that does not require that a suit

15    had been commenced?  Doesn't that suggest that the fact that

16    the suit has not been commenced is not an impediment to a 1782

17    proceeding?

18    MR. TYSSE:  Your Honor, I think that is true in the

19    mine-run of cases where you have a suit that is soon to be

20    brought, for example, in some preliminary stages, but has

21    simply not been initiated.  I don't think it's the case,

22    respectfully, where the parties are still deciding whether or

23    not they have a claim to bring.  The discovery they are seeking

24    is going to inform the decision of whether or not a claim

25    exists.  Because, again, while they assume here that the fraud,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SPA-27

27

O4AABanC

1    if any, was committed by Westmont, that's what they've

2    represented.  What if the documents they get suggest that the

3    fraud was committed by some other party, either one of the

4    Elliott respondents or the A & M respondents or some third

5    party we don't even know about?

6            So I do think this is a sort of a different situation

7    in kind where we are unfortunately trying to defend against

8    this discovery from a lawsuit that has not even been initiated

9    and may well never be initiated.  I think they told Magistrate

10   Judge Parker that whether or not they could bring the suit was

11   the purpose of getting this discovery.  They need it to make

12   that determination.

13           So that kind of goes to our concern.  I understand

14   it's water under the bridge.  Your Honor already ruled on that,

15   but I do think it's a relevant consideration not only with

16   respect to the for use factor, but also with respect to allow

17   this discovery to go forward.  Even if it's statutorily

18   permissible, perhaps this is a circumstance where you say, you

19   know, since you have not actually brought these claims, you

20   might be better off simply going to England in the first

21   instance and getting those claims, you know, seeking the

22   discovery there, where in fact you've agreed to litigate any

23   dispute related to this transaction.  And if the U.K. court

24   grants you discovery and you're able to bring the claims,

25   great.  If they don't, that's simply a function of the forum

SPA-28

28

O4AABanC

1   you chose with all of the intended discovery rules.

2              THE COURT:  Thank you.  Please proceed.  Anything

3   else?

4              MR. TYSSE:  Yes, your Honor, just a few other quick

5   points.  Again, I think respondents have suggested that there's

6   an exhaustion requirement.  I think the *Frasers Group* -- or

7   there's no exhaustion requirement, excuse me.  I think they are

8   correct that there is no per se exhaustion requirement, but as

9   *Frasers* made clear, it's well within your Honor's discretion to

10  consider the possibility that the applicant could obtain the

11  discovery in the foreign proceedings along with other factors,

12  and that's all we're urging you to do.  And I think, again, we

13  talked about the close relationship.  I think we've cited

14  *Frasers Group*, but I think *Frasers Group* is in accord with

15  other decisions of the Southern District of New York.  There's

16  a case called *In re Atvos*, A-T-V-O-S, *In Re Application of*

17  *Elvis Presley*, both of which were cited in our briefing, that's

18  allowed or find that entities are closely related

19  notwithstanding that they are not the exact same entity, but

20  are simply affiliates of one another.

21             Finally, I don't think the petitioners have shown that

22  discovery would be unattainable without the aid of 1782.

23  Again, I think they have already said that it's possible that

24  all the documents would be in Westmont's possession on page 24

25  of their petition, and that makes sense since they're mostly

O4AABanC

1   seeking things like communications between Westmont and the

2   Elliott respondents and the A & M respondents.  And I think

3   that's obviously relevant.  That's what *Frasers Group* said and

4   that's what Intel relied on and said essentially the reason why

5   we don't allow parties to pursue discovery from their foreign

6   adversaries, or as the circuit has held for all intents and

7   purposes, from your foreign adversaries because that's what the

8   foreign proceeding is for.  This is not a situation where you

9   are seeking documents from a bank or telephone provider.  You

10  are seeking documents from the party that's mixed up in the

11  exact allegations that you're raising.  And so you should do it

12  in the forum where you've agreed to do so with its rules.

13          And as the Southern District of Texas said on that

14  point specifically, if the evidence sought by the petitioner is

15  unattainable at this point, it's because they could not satisfy

16  the requirements of the English discovery process, not because

17  the parties beyond the English court's jurisdictional reach,

18  which is the primary concern with allowing discovery outside of

19  the forum.

20          Finally, let's just quickly walk through the burden

21  points, you know.  I think a few things.  First, the fact that

22  the relevant documents were created overseas and certainly all

23  accessible overseas belong 99 percent to Elliott U.K. rather

24  than U.S. entity I think supports the burdensomeness of this

25  inquiry.  That's what the Southern District of Texas also held

SPA-30

30

O4AABanC

1   when it noted all the relevant documents and custodians are

2   located in England.  And again, the subpoenas here all seek

3   testimony from a custodian, all of which would be in the U.K.

4   I think that's relevant.  I think petitioners cited in reply

5   brief a case called *In re Del Valle Ruiz*, 939 F.3d 520, for the

6   proposition that there's no per se bar to extraterritorial

7   discovery.  But the case goes on to make immediately clear that

8   a district court is not categorically barred from allowing

9   discovery under Section 1782 of evidence located abroad.

10          With that said, we note that a court may properly and

11  in fact should consider the location of documents and other

12  evidence when deciding whether to exercise its discretion to

13  authorize such discovery.  And again I don't think it can be

14  the case that the location they were talking about has to be

15  where it's accessible or where it can be, you know, procured

16  because I think it's really talking about potentially the locus

17  of where the documents -- where with the custodian is, where

18  the documents are primarily created.  Because otherwise --

19  because the Court made that statement in the context of the

20  Federal Rules of Procedure which authorize "extraterritorial

21  discovery so long as the documents to be produced are within

22  subpoenaed parties' possession, custody, or control."  I think

23  if the evidence were extraterritorial, in the sense that it's

24  inaccessible, then they could not also be within the subpoenaed

25  parties' possession, custody, or control.

O4AABanC

1          Last point I'll make on this burden point is that --

2   well, I guess two more points.  One is that many of the burdens

3   here are similar to the ones enunciated in the *Frasers Group*

4   case regarding Federal Rule 26 standards, but I think there's

5   one other point too, which is that there are other burdens that

6   stem directly from this process including potential European

7   privacy restrictions, such as the GDPR.  This is something the

8   magistrate judge raised last time, and it's mentioned in

9   petitioner's brief.  We don't know exactly how all those

10  restrictions would fully apply but I think it -- so something

11  that might potentially work out, you know, at the stage where

12  documents are actually being produced and raised then.  But I

13  will point out that it kind of goes to the oddity of the

14  situation here because typically those rules apply when

15  documents are being transferred from Europe or the U.K. to the

16  United States.  And that's essentially what would be happening

17  here.  The documents would be moving from their primary

18  location in the U.K. to the U.S. to then be sent back to the

19  U.K. for purposes of this discovery that they requested.  And

20  again, I think it just goes to show the oddity of allowing

21  Section 1782 discovery in a case to seek foreign discovery for

22  use in a foreign proceeding.

23          So I guess at the end I just urge the Court, as the

24  Court has broad discretion, it may but need not grant this

25  discovery.  So we would certainly urge you considering all the

SPA-32

32

O4AABanC

1    circumstances of this case and what seems to us a pretty clear

2    case of evading their agreement to litigate this in the U.K. to

3    deny the discovery they've sought in its entirety.

4           THE COURT:  Thank you.

5           MR. TYSSE:  Thank you, your Honor.

6           THE COURT:  Let me turn to counsel for petitioner for

7    any argument in response.  And I apologize in advance, you're

8    about to hear a number of beeps on the line as another

9    conference joins us.  But let's see if we can finish our work

10   here now and then I'll talk about next steps.

11          Go ahead, counsel for petitioner.

12          MR. KIM:  Thank you, your Honor.  Austin Kim for the

13   petitioners.

14          I'll start with the argument that had been made by

15   both respondents that there's some U.K. procedure that's

16   available.  That's just not true.  And I'll cite to the Elliott

17   respondent's declaration that's at ECF 35, paragraph 11.  The

18   procedure that the respondents are relying on is a pre-action

19   disclosure procedure under English law concerning parties to a

20   litigation.  And I've said before, and I understand that

21   Mr. Tysse is a little skeptical, and I'll say it again, the

22   only target is Westmont.  If it gives the respondent some

23   comfort, I think that one appropriate way that we can address

24   this issue is your Honor could put use restriction in your

25   order saying that the documents can only be used in the

SPA-33

O4AABanC

1  litigation against Westmont.  I think that addresses completely

2  the concerns that they may have.  I'm saying it.  We've said in

3  our papers, but if your Honor put an order, that might address

4  the issue.

5       But there are no English procedures that have been

6  identified by any party that would allow for the disclosure

7  that we are seeking.  So 1782 is necessary to obtain the

8  documents and information that we would need to prepare and

9  prosecute the English proceedings.

10      The second point is that a lot of time was spent on

11 the forum selection clause.  Now Mr. Tysse has cited to some

12 older cases dealing with circumstances where a law firm, a U.S.

13 law firm for a client may be in possession of documents of a

14 foreign legal adversary, an actual party to a foreign

15 litigation.  That's the *Alghanim* case and that's also I believe

16 the Second Circuit case had been cited as well.  But note that

17 was law firms, and that's complete different circumstances

18 because a law firm is an agent of the client.

19      Here there is no agency relationship.  They are two

20 independent economic entities that happened to join together as

21 a form of joint venture vehicle.  So I don't think that there

22 is any similarities between an attorney/client relationship and

23 a coinvestor relationship in terms of being closely related.

24      The bigger point as well is that this is an English

25 forum selection clause and the respondents are relying on U.S.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SPA-34

34

O4AABanC

1    law, and when a U.S. litigant, as a non-signatory, may have the

2    right to enforce or may be subject to a forum selection clause

3    in the United States.  I haven't seen anything in the record

4    that discusses whether non-signatory rights exist in the U.K.

5    Because presumably if they are claiming to have rights to

6    enforce English forum selection clause, then they would need to

7    present something that under English law -- English courts also

8    recognize this concept of non-signatory rights to enforce a

9    forum selection clause, so that doesn't exist.  And the *Magi*

10   case that Mr. Tysse cited (indiscernible) 1782 case, just the

11   general run-of-the-mill litigation in the United States.

12           The next point is that I believe Mr. Tysse has -- I

13   mean, I'm not going to put words in his mouth but the gist that

14   I got was that all of the documents that we're talking about

15   here are part of one pool.  They're accessible from New York.

16   There are no privacy issues because they're already accessible

17   here.  Whether somebody was sitting on a computer desk in

18   Canada or Mexico or Australia, that is sort of irrelevant.

19   It's the test is whether the respondents, the targets of this

20   1782 proceeding have possession, custody, and control of

21   documents.  Splicing it to particular custodians, I'm just not

22   aware of any principle that allows for that because there is a

23   broad principle that if the custodians here, meaning the

24   Elliott France and the other Elliott respondents or the A & M

25   respondents have access to documents, that's sufficient.

O4AABanC

1          And this goes in line with *In re Top Matrix*.  That's

2     2020 WL 248716 with Judge Ramos under similar circumstances

3     held that just because the parent company is not the foreign

4     litigant but a subsidiary is, it doesn't mean the parent

5     company shielded from producing documents to the extent they

6     have access and custody and control.

7          The same was renounced *In re Polygon* at 2021 WL

8     2117397 and that's at page 8.  So the Courts in this district,

9     in this circuit, have considered this issue before.  And in

10    light of splicing out who the primary custodian and who drafted

11    the e-mail from where, the fundamental question is do you have

12    possession, custody, and control of the discovery being sought.

13    And here it looks like the Elliott respondents have possession,

14    custody, and control of all of the documents.  Now --

15          THE COURT:  I'm sorry, counsel.  I apologize.  And let

16    me just say for the parties that are dialing in for the Chin

17    matter, this is Judge Woods, if you wouldn't mind please

18    continue to just wait patiently with your phones on mute as if

19    you were walking in the courtroom with a proceeding going on

20    before you.  I apologize.  We'll be with you shortly.

21          But, counsel for petitioner, what's the right

22    governing principle here?  You heard counsel for the Elliott

23    respondents argue that the Court should consider in essence

24    whether or not the 1782 proceeding is a vehicle to evade

25    foreign proof gathering limitations and to seek through 1782

36

O4AABanC

1   discovery that can be obtained through foreign entities.

2           Is there a limiting principle that you would

3   articulate, or is it your view that so long as there is a

4   corporate affiliate of a foreign entity located in the United

5   States, you can get all of the documents that the foreign

6   affiliate has so long as you're seeking the documents from the

7   U.S. based affiliate and they share I'll call it a computer

8   system.  Is there a limiting principle or does 1782 open up the

9   world to any company that has an affiliate that does business

10  if the U.S.?

11          MR. KIM:  Well, I would say, your Honor, that in this

12  case in particular that the limiting principle be if, for

13  example, the local affiliate had no supervisory control over

14  the foreign entity if the local affiliate were just a garage

15  with two guys and the computer, but they had otherwise no

16  supervisory control, no ownership interest in something like

17  that, where it's really tangentially related, that would be a

18  limiting principle.

19          But here, all the respondents, A & M, the A & M

20  respondents are the supervisory head and owner of all of the

21  other A & M entities, including the entities that the

22  respondents claim are located abroad.  And with regard to the

23  Elliott respondents, we know that the two U.S. entities were

24  the pocketbook.  And so in those circumstances I believe that

25  when you're the global head or when you're the ultimate

O4AABanC

1   investor, that it would be fair game to have documents in their

2   possession, custody, and control produced in response to a 1782

3   petition.

4          With regard the respondent's reliance on the *Frasers*

5   *Group* case, the *Frasers Group* case, and this is going back to

6   where I started, and a lot of the arguments that have been made

7   by respondents so far today, it relies on the target of the

8   1782 or the affiliate or subsidiary of the target of 1782 being

9   a party to the foreign case.  And that's just not the case

10  here.  We are not going to sue Elliott, Elliott U.K.  We're not

11  going after A & M or A & M France or U.K. entity.  It's against

12  Westmont.  And so that's where *Frasers Group*, the reliance on

13  *Frasers Group* falls apart.  Because *Frasers Group*, it relied on

14  the fact that the Morgan Stanley's affiliate, who was the party

15  in the U.K. action, made two concessions.

16         The U.K. affiliate made two concession.  That, one,

17  documents located in the United States would be discoverable in

18  the U.K. and they would not object.  And then second, that it

19  included Morgan Stanley's CEO, who was the sole target of the

20  1782 petition.  So I haven't heard from the other side that

21  they would consent to an English court disclosure order

22  assuming that that procedure be possible because the only

23  procedure that's been identified is the pre-action petition for

24  discovery as to a party or a potential party to a U.K. action.

25  That doesn't exist here.  So I'm not even sure if the procedure

O4AABanC

1    announced in *Frasers Group* could even apply here.  Because in

2    *Frasers Group*, it was undisputed that Morgan Stanley's

3    affiliate was subject to English court jurisdiction, they would

4    participate in discovery, and they would turn over documents.

5    That hasn't been -- there's nothing in the record that would

6    support that conclusion here.

7            Now, I would say as to the forum selection clause,

8    there's a more recent decision, and this is from January of

9    this year*, In re BM Brazil*, 2024 WL 555780, where it's more apt

10   in analogous to this situation because it dealt with targets of

11   a 1782 who are non-signatories to the forum selection cause

12   attempting to enforce a forum selection cause to stop 1782.

13   And there Magistrate Judge Stein went through a pretty detailed

14   analysis as to why a non-signatory who has presented no

15   evidence that under the foreign law they would be entitled to

16   enforce the forum selection clause should be able to use it to

17   stop 1782.  And so that's the exact same circumstance here.

18   You know, they rely on --

19           THE COURT:  I'm sorry.  Can I pause you on that?  I

20   apologize.

21           MR. KIM:  Yes.

22           THE COURT:  Counsel for the Elliott respondents talked

23   about this in two different veins.  One is a standing argument.

24   And two, as I'll call it sort of an equity-based argument.  Was

25   Judge Stein's analysis to the effect that the entity did not

O4AABanC

1    have standing to enforce the forum selection clause as opposed

2    to the second thread that counsel for the Elliott respondents

3    just argued for, namely that is a discretionary factor that

4    should be considered regardless of whether or not they have

5    standing to enforce it?  How do you read Judge Stein's ruling?

6           MR. KIM:  Well, the way I read Judge Stein's ruling is

7    that, you know, relying on U.S. -- when he came out, was that

8    there was no evidence that under foreign law the forum

9    selection -- I think it was an English forum selection clause.

10    There was no evidence in the record that under English law a

11    non-signatory had any rights to enforce a forum selection

12    clause.  And that's what -- that's what exists here.  They just

13    assume, I mean, I name the respondents here.  Assume they had

14    the right because in the United States a non-signatory has the

15    right if they're closely related to enforce a forum selection

16    clause in the United States.  I have no idea how English law

17    shakes up on this issue.  So if it turns out that on an English

18    law, the Elliott respondents have no rights, then what are we

19    talking about?  You know, I think it's incumbent on the

20    respondents if they want to enforce a foreign forum selection

21    clause that they need to come forward with evidence that they

22    have rights to enforce a foreign forum selection clause under

23    the foreign law, which hasn't been done.

24           The next point is that *Kiobel* was the other case they

25    talked about that had a forum selection clause.  That's also a

SPA-40

O4AABanC

1    law firm.  It had nothing to do with a coinvestor.

2          Now the next point on the GDPR privacy issues, and I

3    think I touched on this earlier but the documents already here

4    and accessible here, but even if they weren't and my

5    understanding is -- I'm not an expert of the GDPR.  My

6    understanding of the GDPR is there is a specific litigation

7    exemption, meaning that if there happens to be personal

8    identifying information that is going to be transferred across

9    border, although typically there are some privacy protections

10   in place, there is specific exemption if the documents are

11   going to be used for the purposes of litigation.  So there are

12   no GDPR privacy law concerns because that's exactly the purpose

13   of the 1782, is to obtain documents and information for use in

14   a litigation.

15         Let me see here.  Reliance on the Southern District

16   of -- I will just say --

17         THE COURT:  Thank you.  That was not about Elliott but

18   instead about the target.

19         MR. KIM:  Right.

20         THE COURT:  Anything else, counsel for petitioner?

21   Otherwise I'm going to thank the parties for your arguments and

22   ask you to be on the lookout for an order from the Court so I

23   can turn to my next group of counsel.

24         Anything else that we need to talk about here?  First,

25   counsel for petitioner.

SPA-41

41

O4AABanC

1    MR. KIM:  Yeah, I would just say that a lot of time

2  was spend on third factor, but I still haven't heard proof

3  gathering restriction.  The only thing they've come with is the

4  English procedure for pre-action disclosure against a party to

5  a proceeding, which doesn't apply here.  And the second is the

6  forum selection clause, which I don't believe that there's any

7  evidence that they have rights under English law as a

8  non-signatory to enforce.

9    Otherwise, I think we've covered the other issues and

10  I thank your Honor for your time.

11    THE COURT:  Thank you, counsel.  Counsel for A & M,

12  anything else you want to add?

13    MS. KLEIN:  Thank you, your Honor.  Kerrin Klein from

14  A & M.  I just wanted to briefly note two brief points for A &

15  M.  Counsel for petitioner said that there was no proof

16  gathering restrictions.  That's just not true.  We cited in our

17  brief a quote from the South Carolina case which was a U.K.

18  case introduced by counsel for petitioner where the Court

19  specifically said that typically discovery from third parties

20  is not allowed in this context for the protection of those

21  third parties.

22    So there is a restriction in our view, and petitioner

23  is attempting to evade that restriction, circumvent it, by

24  going after not A & M France, not A & M U.K., who is A & M

25  France's corporate parent, but the corporate parent of the

SPA-42

42

O4AABanC

1    corporate parent, and other indirect affiliates who, as we

2    stated before, have zero involvement with the transaction at

3    issue, zero involvement with the diligence, and do not, as

4    petitioners have claimed, have any direct type of supervisory

5    role over A & M France as that was the U.K. entity.

6           THE COURT:  Thank you.  Anything else, counsel for the

7    Elliott respondents?

8           MR. TYSSE:  Thanks, your Honor.  Just 30 seconds if

9    you'll indulge me.  The first, in the *Frasers Group* case, the

10   stipulation was with respect to whether the parties would

11   object to producing materials in England on the basis of their

12   location.  We can stipulate the same thing.  If Elliott U.K.

13   were properly sued or discovery was properly sought against

14   them in England, it would not object to producing materials in

15   England from the other Elliott respondents on the basis of

16   those documents' location in the U.S., to the extent there are

17   any special documents here, which we don't believe there are.

18          The other point is just that the *Frasers Group* case,

19   the CEO of Morgan Stanley clearly has possession, custody, or

20   control of the documents in that case.  And nevertheless,

21   Second Circuit found no use of discretion in denying discovery

22   from him on the ground that discovery was better sought and

23   more appropriately sought in the U.K.

24          And for the reasons you mentioned, including the

25   policy note that this would encourage companies to maintain

SPA-43

43

O4AABanC

1    segregated computer systems so as not to expose themselves to

2    discovery around the world, we think that shows why my friend

3    on the other side's rule can't quite possibly be so broad.  And

4    given there's no unfairness in holding them to the bargain that

5    they struck, we urge you to deny the discovery.

6            THE COURT:  Good.  Thank you very much.

7            So counsel in this matter, I'm referring to the Banoka

8    case, thank you for your arguments.  Be on the lookout for an

9    order from the Court about next steps.  You should feel free to

10   disconnect.

11           (Adjourned)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SPA-44

1

O4B8BANC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   BANOKA, S.A.R.L., *et al.*,

4                   Petitioners,

5           v.                          22 MC 182 (GHW)

6   ALVAREZ & MARSAL, INC., *et al.*,

7                   Respondents.         Remote Conference

8   ------------------------------x

9                                       April 11, 2024
                                        3:00 p.m.
10
    Before:
11
                      HON. GREGORY H. WOODS,
12
                                        District Judge
13
                        APPEARANCES
14
    MEISTER SEELIG & FEIN LLP
15        Attorneys for Petitioners
    BY:  AUSTIN D. KIM
16
    OLSHAN FROME WOLOSKY LLP
17        Attorneys for A&M Respondents
    BY:  KERRIN T. KLEIN
18
    AKIN GUMP STRAUSS HAUER & FELD LLP
19        Attorneys for Elliott Respondents
    BY:  JAMES E. TYSSE
20

21

22

23

24

25

SPA-45

2

O4B8BANC

1           (The Court and all parties appearing telephonically)

2           THE COURT:  Let me begin by taking appearances from

3    the parties.

4           First off, who is on the line for petitioner?

5           MR. KIM:  Good afternoon, your Honor.  Austin Kim from

6    Meister Seelig & Fein for the petitioners.

7           THE COURT:  Thank you.

8           Who is on the line for the A&M respondents?

9           MS. KLEIN:  Good afternoon, your Honor.  Kerrin Klein

10   from Olshan on behalf of the A&M respondents.

11          THE COURT:  Thank you.

12          And who is on the line for the Elliott respondents?

13          MR. TYSSE:  Good afternoon, your Honor.  James Tysse

14   on behalf of the Elliott respondents.

15          THE COURT:  So let me give you a few brief

16   instructions about the rules that I would like the parties to

17   follow during today's conference.

18          At the outset, please remember that this is a public

19   proceeding.  As a result, any member of the public or press is

20   welcome to dial in.  I am not monitoring who is auditing the

21   conference.  I just wanted to remind you of that.

22          Second, please state your name each time that you

23   speak during today's conference.

24          Third, please keep your lines on mute at all times

25   except when you're intentionally speaking to me or to another

SPA-46

3

O4B8BANC

1  representative of a party.

2          Fourth, please abide by instructions from our court

3  reporter that are designed to help her do her job.

4          And finally, I am ordering that there be no recording

5  or rebroadcast of all or any part of today's conference.

6          Counsel, thank you for rejoining after yesterday's

7  conference.  I had another conference scheduled so I wasn't

8  able to continue yesterday, but I wanted to thank you for your

9  arguments.

10         I have heard your arguments, and so what I wanted to

11  do today is really just to ask for your indulgence as I resolve

12  the remaining issues in the case, not all of the issues, as it

13  turns out, but most of the issues in the case.  And I am going

14  to do that orally.  So I would ask that you bear with me as I

15  tell you my ruling and the reasoning behind it.

16         I am going to start with I, an introduction.

17         I scheduled this conference to address petitioners'

18  application under 28 U.S.C., Section 1782 ("Section 1782").  On

19  March 22, 2024, I published an opinion holding that petitioners

20  had met the statutory requirements of Section 1782.  Yesterday,

21  I heard arguments from the parties about whether I should

22  exercise my discretion to grant the petition.

23         I am ready to issue my decision.  I am going to do so

24  orally.  Because the parties are familiar with the underlying

25  facts and procedural history, I will not recite them all here.

SPA-47

4

O4B8BANC

1    The facts and procedural history that are relevant to my

2    decision are embedded in my analysis or alluded to in my

3    analysis.  For the reasons that follow, I am going to grant in

4    part the petition with respect to Respondents Elliott

5    Associates, L.P. and Elliott International, L.P. (collectively,

6    with Elliott Investment Management, L.P., and Elliott

7    Management Corp., the "Elliott Respondents").  But I am going

8    to deny the petition with respect to Respondents Alvarez &

9    Marsal France SAS, Alvarez & Marsal, Inc., Alvarez & Marsal

10   Transaction Advisory Group, LLC, Alvarez & Marsal Holdings,

11   LLC, Elliott Investment Management, L.P., and Elliott

12   Management Corp.

13            II.  Discussion.

14            "Once the statutory requirements are met, a district

15   court is free to grant discovery in its discretion ... the

16   Supreme Court has outlined a number of factors that 'bear

17   consideration in ruling on a Section 1782 request.'"

18   *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 80

19   (2d Cir. 2012).  Those factors consist of:

20            "(1) whether 'the person from whom discovery is sought

21   is a participant in the foreign proceeding,' in which event

22   'the need for 1782(a) aid generally is not as apparent as it

23   ordinarily is when evidence is sought from a nonparticipant in

24   the matter arising abroad'; (2) 'the nature of the foreign

25   tribunal, the character of the proceedings underway abroad, and

**SPA-48**

O4B8BANC

1   the receptivity of the foreign government or the court or

2   agency abroad to U.S. federal-court judicial assistance'; (3)

3   'whether the Section 1782(a) request conceals an attempt to

4   circumvent foreign proof-gathering restrictions or other

5   policies of a foreign country or the United States'; and (4)

6   whether the request is 'unduly intrusive or burdensome.'"

7           *Kiobel by Samkalden v. Cravath, Swaine & Moore LLP*,

8   895 F.3d 238, 244 (2d Cir. 2018) (quoting *Intel Corp. v.*

9   *Advanced Micro Devices, Inc.*, 542 U.S. 241, 264-265 (2004)).

10          In exercising its discretion, a court should also

11  consider the "twin aims of the statute," namely, "providing

12  efficient means of assistance to participants in international

13  litigation in our federal courts and encouraging foreign

14  countries by example to provide similar means of assistance to

15  our courts." *Schmitz v. Bernstein Liebhard & Lifshitz, LLP*,

16  376 F.3d 79, 84 (2d Cir. 2004) (quotation marks and citations

17  omitted); *accord Brandi-Dohrn*, 673 F.3d at 81. "Courts have

18  wide discretion to determine whether to grant discovery, and

19  can tailor any requested discovery 'to avoid attendant

20  problems.'" *In re Postalis*, 2018 WL 6725406, at *2 (S.D.N.Y.

21  Dec. 20, 2018) (quoting *Application of Esses*, 101 F.3d 873, 876

22  (2d Cir. 1996)).

23          Judge Parker did not reach the application of the

24  discretionary factors in her opinion.  Therefore, the Court

25  applies the factors *de novo*.  *See, e.g., Bristol v. Schenk*,

6

O4B8BANC

1  2017 WL 4277158, at *3 (E.D.N.Y. Sept. 25, 2017) (applying *de*

2  *novo* review to issue not reached by the magistrate judge in a

3  report and recommendation; *United States v. Gallo*, 2000 WL

4  269894, at *1 (S.D.N.Y. Mar. 10, 2000) (same).  The Court will

5  analyze each factor in turn.

6          A.  First Factor.

7          The first factor⸺whether the person from whom

8  discovery is sought is a participant in the foreign

9  proceeding⸺weighs in favor of granting the petition with

10  respect to both the Elliott and A&M respondents.  "When the

11  person from whom discovery is sought is a participant in the

12  foreign proceeding ... the need for Section 1782(a) aid

13  generally is not as apparent as it ordinarily is when evidence

14  is sought from a nonparticipant in the matter arising abroad."

15  *Intel*, 542 U.S. at 264.  This is because "[a] foreign tribunal

16  has jurisdiction over those appearing before it, and can itself

17  order them to produce evidence," whereas "nonparticipants in

18  the foreign proceeding may be outside the foreign tribunal's

19  jurisdictional reach." *Id.*

20          Here, petitioners' proposed proceeding is against

21  Westmont only.  It therefore would not place any of the

22  respondents within the "foreign tribunal's jurisdictional

23  reach." *Id.*  Accordingly, this factor weighs in favor of

24  granting the petition.

25          In their opposition to the petition, the Elliott

SPA-50

O4B8BANC

1    respondents argue that Elliott U.K. is the "real" target of the

2    contemplated foreign proceeding and that "a petitioner may not

3    use Section 1782 to require an affiliate or related third party

4    to obtain documents from its opponent in the foreign

5    litigation."  Dkt. No. 23 (quoting *In re Application of CBRE*

6    *Glob. Invs. (NL) B.V.*, 2021 WL 2894721, at *9 (S.D.N.Y. July 9,

7    2021)).  In support of this argument, the Elliott respondents

8    point to cases in which courts denied Section 1782 applications

9    seeking discovery from entities whose foreign affiliates or

10   clients were parties to the foreign proceeding for which the

11   discovery was sought.  *See, e.g., Kiobel v. Cravath, Swaine &*

12   *Moore LLP*, 895 F.3d 238, 247 (2d Cir. 2018) (denying a Section

13   1782 petition against a United States law firm where "for all

14   intents and purposes" the petition sought discovery from the

15   law firm's client, which was the petitioners' opponent in the

16   foreign proceeding).

17         Here, none of the respondents, nor any of their

18   affiliates, including Elliott U.K., was a party to the

19   proceeding that the Court has held is within reasonable

20   contemplation.  Whether a petitioner views a respondent—or, by

21   extension, its affiliate—"as a potential adversary" in some

22   other hypothetical proceeding "plays no role in the first *Intel*

23   factor."  *In re Accent Delight Int'l Ltd.*, 2018 WL 2849724, at

24   *4 (S.D.N.Y. June 11, 2018) (holding that a respondent's

25   assertion that the requested discovery would be used against it

O4B8BANC

1  in a later proceeding was not relevant to the Court's analysis

2  of the first *Intel* factor) ("Whether petitioners view [the

3  respondent] as a potential adversary plays no role in the first

4  *Intel* factor, which is concerned with the foreign tribunal's

5  ability to control the evidence and order production ..."),

6  *aff'd,* 791 F.App'x 247 (2d Cir. 2019).

7  Moreover, counsel for petitioners has represented on

8  the record that petitioners will not pursue litigation against

9  Elliott U.K., or any other entity besides Westmont, for its

10  role in the failed Westmont transaction.  While they have not

11  stipulated to an agreement not to pursue any claim against the

12  Elliott entities as a condition to receive this discovery, they

13  have offered that they will adhere to a "use" limitation

14  regarding how they will use any information obtained as a

15  result of the discovery—namely, that they will use it only in

16  the contemplated proceeding against Westmont and will not use

17  it in connection with an action against respondents.  I accept

18  counsel for petitioners' proffer, and his proposed "use"

19  restriction.

20  Having considered all of the parties' submissions and

21  arguments, I conclude that the first *Intel* factor weighs in

22  favor of granting the petition with respect to all of the

23  respondents.

24  B.  Second Factor.

25  The second factor—the nature of the foreign tribunal,

9

O4B8BANC

1    the character of the contemplated English proceeding, and the

2    receptivity of English courts to the evidence sought——also

3    weighs in favor of granting the petition.  This factor weighs

4    in favor of granting a Section 1782 petition absent

5    "authoritative proof that a foreign tribunal would reject

6    evidence obtained with the aid of Section 1782." *In re JSC BTA*

7    *Bank*, 577 F.Supp.3d 262, 268 (S.D.N.Y. 2021), *appeal dismissed*

8    (May 10, 2022) (quoting *Euromepa S.A. v. R. Esmerian, Inc.*, 51

9    F.3d 1095, 1100 (2d Cir. 1995) ("Absent this clear directive

10   ... a district court's ruling should be informed by Section

11   1782's overarching interest in providing equitable and

12   efficacious procedures for the benefit of tribunals and

13   litigants involved in litigation with international aspects.")

14   (quotations omitted); *see also In re Application of*

15   *Gemeinshcaftspraxis Dr. Med. Schottdorf*, 2006 WL 3844464, at *6

16   (S.D.N.Y. 2006) (same); *In re Kreke Immobilien KG*, 2013 WL

17   5966916, at *5 (S.D.N.Y. 2013) (same), *abrogated on other*

18   *grounds by In re del Valle Ruiz*, 939 F.3d 520 (2d Cir. 2019).

19            Respondents have offered no such authoritative proof

20   here.  Moreover, petitioners have identified several cases in

21   which English courts have endorsed the use of Section 1782 to

22   obtain nonparty discovery, in addition to other authority

23   suggesting that English courts would be receptive to the

24   discovery petitioners seek.  *See* Dkt. No. 15, paragraphs 39–43.

25   *See also In re BM Brazil 1 Fundo de Investimento em*

O4B8BANC

1    *Participacoes Multistrategia*, 2024 WL 555780, at *11 (S.D.N.Y.

2    2024) ("Courts in this district applying the second Intel

3    factor routinely find that courts in the United Kingdom are

4    receptive to Section 1782 discovery.") (cleaned up).  The

5    Southern District of Texas arrived at the same conclusion in

6    its analysis of this factor with respect to petitioners'

7    Section 1782 petition against Westmont; the Fifth Circuit

8    affirmed that decision.  *Banoka v. Westmont International*

9    *Development, Inc.*, 2022 WL 480118, at *5 (S.D. Tex. 2022),

10   *aff'd, Bissonnet v. Westmont International Development, Inc.*,

11   2022 WL 636680, at *1 (5th Cir. 2022) (per curiam).

12              Having considered all of the parties' submissions and

13   arguments, I conclude that the second *Intel* factor weighs in

14   favor of granting the petition with respect to all of the

15   respondents.

16              C. Third Factor.

17              The third factor—whether the request conceals an

18   attempt to circumvent foreign proof-gathering

19   restrictions—weighs in favor of denying the petition with

20   respect to all of the respondents.  In analyzing this factor,

21   courts should understand proof-gathering restrictions "as rules

22   akin to privileges that prohibit the acquisition or use of

23   certain materials, rather than as rules that fail to facilitate

24   investigation of claims by empowering parties to require their

25   adversarial and nonparty witnesses to provide information."

O4B8BANC

1  *Mees v. Buiter*, 793 F.3d 291, 303 (2d Cir. 2015).  In addition,

2  "1782 contains no foreign discoverability requirement." *Id.*

3  However, "district judges may well find that in appropriate

4  cases a determination of discoverability under the laws of the

5  foreign jurisdiction is a useful tool in their exercise of

6  discretion under Section 1782."  Id. (quoting *Foden v. Gianoli*

7  *Aldunate*, 3 F.3d 54, 60 (2d Cir. 1993).))

8          First, petitioners' broad forum selection clause with

9  Westmont causes this factor to tilt in favor of respondents.

10  "Courts in this district have determined that the petitioners'

11  decision to enter into a forum selection clause is a factor

12  that can weigh against the granting of an application brought

13  under Section 1782."  *In re Saul Klein*, 2023 WL 8827847, at *12

14  (S.D.N.Y. 2023) (quoting *In re Alghanim*, 2022 WL 1423088, at

15  *12 (S.D.N.Y. May 5, 2022), *appeal withdrawn sub nom. Alghanim*

16  *v. Milbank LLP*, 2022 WL 3970921 (2d Cir. June 16, 2022)

17  ("Petitioner's application constitutes an improper attempt at

18  forum shopping.") (collecting cases); *see also In re Kreke*

19  *Immobilien KG*, 2013 WL 5966916, at *7 ("[The petitioner]

20  already assented to foreign authority by signing a contract

21  with [the respondent's parent] that contained a forum selection

22  clause ... Because the petitioner previously agreed to a

23  [foreign] forum with all its requisite procedural rules, an

24  application of U.S. discovery protocol here would evade foreign

25  proof-gathering restrictions ...").  The Southern District of

SPA-55

O4B8BANC

1    Texas arrived at the same conclusion in its analysis of this

2    forum selection clause with respect to petitioners' Section

3    1782 petition against Westmont, and again, the Fifth Circuit

4    affirmed. *Banoka*, 2022 WL 480118, at *5.

5          Petitioners argue that the forum selection clause in

6    this case is not relevant because respondents are not parties

7    to it. But regardless of the parties against whom petitioners

8    are now seeking discovery, petitioners' contemplated proceeding

9    is against Westmont, concerning the sale of Clichy Victor Hugo.

10    Petitioners bound themselves to litigate that matter in English

11    courts, and therefore the forum selection clause is relevant to

12    the Court's analysis.

13          This conclusion comports with Second Circuit case law.

14    In *In re DNG FZE*, the court held that a forum selection clause

15    to which the respondent was not a party weighed against

16    granting a Section 1782 petition because "both parties to the

17    [contemplated proceeding] are sophisticated entities who agreed

18    to a forum selection clause designating the Singapore courts as

19    the site of any litigation." 2024 WL 124694, at *4 (S.D.N.Y.

20    2024). Petitioners are likewise sophisticated parties who

21    bound themselves to litigate this matter in English courts. In

22    *In re Alghanim*, the court held that a forum selection clause to

23    which the respondent was not a party "heightened" concerns

24    about foreign proof-gathering restrictions because the "real

25    party in interest" was a party to the forum selection clause.

SPA-56

O4B8BANC

1    2022 WL 1423088, at *12.  Compare *In re Alghanim*, 2022 WL

2    1423088 with *In re BM Brazil 1 Fundo de Investimento em*

3    *Participacoes Multistrategia*, 2024 WL 555780, at *13 (S.D.N.Y.

4    2024) (holding that a forum selection clause to which the

5    respondent was not a party did not impact the court's analysis

6    because the respondent, and not the other party to the forum

7    selection clause, was "the real party in interest—the

8    application [was] not a backdoor attempt to obtain" documents

9    belonging to the other party to the forum selection clause).

10   Here, petitioners' Section 1782 petition is openly an attempt

11   to obtain communications from Westmont that demonstrate its

12   state of mind.  Petitioners filed this Section 1782 petition

13   against respondents only because they were deterred from

14   subpoenaing Westmont directly.  Therefore, the Court finds that

15   the forum selection clause is relevant to its analysis.  Its

16   existence is not dispositive—I am not ruling that the

17   respondents have standing to enforce the forum selection

18   clause—but the fact that petitioner agreed to pursue

19   litigation related to the transaction in the U.K., subject to

20   U.K. proof-gathering limitations, weighs against granting the

21   petition.

22        Second, while the parties have not identified any

23   English "prohibitions" on the use or acquisition of the

24   requested materials, respondents argue that there are no

25   available procedures under English law through which

SPA-57

14

O4B8BANC

1   petitioners could obtain the requested discovery.  Petitioners

2   cannot seek the requested materials from Westmont directly

3   through litigation because they acknowledge they lack

4   sufficient evidence to commence their suit.  Respondents have

5   also submitted an affidavit and cited to case law to assert

6   that an English court would be unlikely to allow petitioners to

7   seek pre-suit discovery of the requested materials from

8   Westmont or from respondents.  Dkt. No. 29 at 14, 35.

9   Petitioners do not dispute those assertions.  The Court does

10  not afford the foreign discoverability of the requested

11  materials "undue weight," but considers it alongside the forum

12  selection clause.  *Mees*, 793 F.3d 291 at 303.  Collectively,

13  they weigh against the petition.

14          Having considered all of the parties' submissions and

15  arguments, I conclude that the third *Intel* factor weighs

16  against granting the petition with respect to all of the

17  respondents.

18          The Court finds that the fourth factor also weighs

19  against granting the petition with respect to all of the

20  respondents, other than Elliott Associates, L.P. and Elliott

21  International, L.P.  And as to those two defendants, the fourth

22  factor weighs in favor of sharply curtailing the scope of

23  discovery that should be permitted of—and through—them.  "[A]

24  district court evaluating a Section 1782 discovery request

25  should assess whether the discovery sought is overbroad or

15

O4B8BANC

1    unduly burdensome by applying the familiar standards of Rule 26

2    of the Federal Rules of Civil Procedure." *Mees*, 793 F.3d 291 at

3    302.  Pursuant to Rule 26, the Court must consider whether the

4    discovery sought is "relevant" and "proportional to the needs

5    of the case."  Fed.R.Civ.P. 26(b).  In addition, when

6    considering an application for discovery under Section 1782 "a

7    court may properly, and in fact should, consider the location

8    of documents and other evidence when deciding whether to

9    exercise its discretion to authorize such discovery."  *In re*

10   *del Valle Ruiz*, 939 F.3d at 533 (2d Cir. 2019).

11            Here, the evidence petitioner seeks of Westmont's

12   state of mind is relevant to its contemplated case.

13            However, the requests are unduly broad, comprising 14

14   expansive categories, most of which seek "all documents and

15   communications" related to various issues without limitation.

16   As framed, these requests are unduly burdensome.  Dkt. No. 51

17   at 6-7.  See also Dkt. Nos. 17-1-17-7.  Petitioner also seeks

18   deposition testimony from employees of respondents.  See id.

19   However, broad ranging depositions are expensive and

20   burdensome, and given that the employees of the

21   respondents——other than perhaps Elliott L.P. and Elliott

22   International L.P.——were not directly involved in the failed

23   transaction, requiring their employees to provide testimony

24   appears to be disproportionate to the needs of the case.  The

25   Court believes that the overbreadth issue weighs against

O4B8BANC

1   granting the petition with respect to all of the respondents,

2   but, as I will explain later, I believe that the overbreadth

3   issues can be redressed by "issuing a closely tailored

4   discovery order rather than [] simply denying relief outright."

5   *Euromepa*, 51 F.3d at 1101.

6         However, the location of the records sought and the

7   other factors weigh heavily against granting the application as

8   to the A&M respondents.  With respect to them, it is undisputed

9   that the materials sought are located abroad.  "Only A&M

10   France, and not the A&M respondents, provided diligence

11   services" related to the transaction.  Dkt. No. 31, paragraph

12   54.  While "a district court is not categorically barred from

13   allowing discovery under Section 1782 of evidence located

14   abroad ... a court may properly, and in fact should, consider

15   the location of documents and other evidence when deciding

16   whether to exercise its discretion to authorize such

17   discovery."  *In re del Valle Ruiz*, 939 F.3d 520, 533 (2d Cir.

18   2019).  Here, the A&M respondents represent, and petitioner

19   proffers no facts to the contrary, that "all of the documents

20   that may be responsive to the proposed subpoenas are located in

21   France, and there are no responsive documents in the United

22   States."  Dkt. No. 31, paragraph 5.  "Those burdens will

23   continue to exist no matter how the court tailors the discovery

24   in this case."  *In re Gorsoan Ltd.*, 2021 WL 240736, at *7

25   (S.D.N.Y. Jan. 25, 2021).  Therefore, the fourth factor weighs

O4B8BANC

1   heavily against granting the petition with respect to the A&M

2   respondents.

3            Moreover, counsel for the A&M respondents has

4   represented that "to the extent that any entity other than A&M

5   France can be deemed to be in possession, custody, or control

6   of the documents held by A&M France, that entity would be A&M

7   Europe Holdings." Dkt. No. 29, at 12. The Second Circuit has

8   made clear that the permissibility of extraterritorial

9   discovery only applies to documents "within the subpoenaed

10  party's possession, custody, or control," in accordance with

11  Fed.R.Civ.P. 45. *Valle Ruiz*, 939 F.3d at 533. When a party

12  contests it has possession, custody, or control of the

13  requested documents, "the discovering party must make an

14  adequate showing to overcome this assertion." *Bank of New York

15  v. Meridien BIAO Bank Tanzania Ltd.*, 171 F.R.D. 135, 147

16  (S.D.N.Y. 1997). Petitioner has made no such showing, and

17  therefore the Court accepts that the A&M respondents lack

18  possession, custody, or control of the documents petitioners

19  request. This weighs heavily against granting the application.

20           The fourth factor weighs substantially less heavily

21  against granting the petition with respect to Elliott

22  Associates, L.P. and Elliott International, L.P. Unlike the

23  A&M respondents, the Elliott respondents do not represent that

24  no responsive documents are located in the United States. They

25  say that there will be very few documents in their hands, as

O4B8BANC

1    opposed to Elliott U.K.  As we discussed at length during

2    argument yesterday, Elliott Associates, L.P. and Elliott

3    International, L.P. also have a direct connection to the

4    transaction with Westmont.  Elliott Associates, L.P. and

5    Elliott International, L.P. created an investment vehicle with

6    Westmont, WNE Investor Sarl.  Dkt. No. 36, paragraph 7.  Those

7    two Elliott entities are the substantial majority owners of WNE

8    Investor Sarl, which would have provided capital for the

9    Westmont transaction had it come to fruition.  Id.  WNE

10   Investor Sarl also retained A&M France to conduct due diligence

11   on CVH for the transaction.  Dkt. No. 36, paragraph 2.

12   Additionally, Elliott Associates, L.P. and Elliott

13   International, L.P. are advised by Elliott U.K., which

14   "communicated with Westmont regularly through the ...

15   negotiations." *Id.*, paragraph 9.  Therefore, the fourth factor

16   does not weigh as heavily against granting the petition with

17   respect to Elliott Associates, L.P. and Elliott International,

18   L.P.

19          In contrast, the record does not show that the

20   remaining Elliott respondents, Elliott Investment Management,

21   L.P., and Elliott Management Corp., had a direct connection

22   with the transaction with Westmont.  The record does not show

23   that they were involved in the creation and operation of the

24   WNE Investor Sarl entity or that they had a direct relationship

25   with Elliott U.K.  Nor are there other facts in the record

SPA-62

O4B8BANC

1    suggesting that they would be parties to any communications

2    with Westmont regarding the transaction.  Therefore, the fourth

3    factor weighs more heavily against granting the petition with

4    respect to those respondents.

5         Balancing the four discretionary factors, the Court

6    finds that they weigh against granting petitioners' application

7    with respect to the A&M respondents, Elliott Investment

8    Management, L.P., and Elliott Management Corp.  In contrast,

9    with respect to Elliott Associates, L.P. and Elliott

10   International, L.P., the balance tips in favor of potentially

11   granting the request because they were directly involved in the

12   transaction through the development of the financing vehicle

13   with Westmont.  However, the Court concludes that the discovery

14   requests, as currently drafted, are unduly burdensome, and are

15   disproportionate to the needs of the case, and that, by seeking

16   through the Elliott U.S. entities documents located abroad,

17   they should be limited.

18        Accordingly, petitioners' application with respect to

19   the A&M respondents, Elliott Investment Management, L.P. and

20   Elliott Management Corp. is denied.  But petitioners may

21   resubmit their proposed subpoenas with respect to Elliott

22   Associates, L.P. and Elliott International, L.P.

23        In order for these subpoenas to be permissible under

24   the balancing test, they must be subject to several

25   limitations.  First, they must embody a use restriction of the

O4B8BANC

1    type agreed to by counsel for plaintiff.  Records received must

2    be used only in connection with the contemplated proceeding

3    against Westmont and may not be used in a proceeding against

4    the respondents.

5         Second, petitioners may only seek responsive materials

6    located in the United States.  Without that limitation, the

7    fourth *Intel* factor would weigh against granting the request,

8    given the Second Circuit's holding that "a court may properly,

9    and in fact should, consider the location of documents and

10   other evidence when deciding whether to exercise its discretion

11   to authorize such discovery."  *In re del Valle Ruiz*, 939 F.3d

12   at 533 (2d Cir. 2019).

13        Third, petitioners may only seek documentary materials

14   with respect to which Elliott Associates, L.P. and Elliott

15   International, L.P. are parties, or signatories, or direct

16   participants.  In particular, the Court believes that this

17   application would be unduly burdensome and disproportionate to

18   the needs of the case to the extent the discovery sought are

19   records of Elliott U.K. to which the other Elliott entities

20   have access as a result of a shared IT platform, or a

21   contractual or other right to request production of such

22   records to them.  The Court understands from counsel's

23   representations that the Elliott respondents might have control

24   over documents for which only Elliott U.K., and not any of the

25   respondents, is a primary custodian.  Because Elliott U.K. is a

21

O4B8BANC

1  foreign entity, allowing petitioners to effectively seek

2  discovery materials located in England from Elliott U.K. as a

3  result of any shared IT platforms or control arrangement with

4  Elliott Associates, L.P. and Elliott International, L.P. would

5  heighten the Court's concerns about forum shopping and attempts

6  to evade foreign proof-gathering restrictions.  Moreover, the

7  Court must consider the "aims of the statute" in exercising its

8  discretion to grant a Section 1782 petition.  *Schmitz*, 376 F.3d

9  at 84.  The purpose of Section 1782 is to facilitate discovery

10 from U.S. entities for use in foreign litigation.  Allowing

11 petitioners to use Section 1782 to obtain discovery from

12 foreign entities via their U.S. affiliates merely because they

13 share an IT server is arguably in tension with that purpose.

14 It also effectively collapses corporate separations and

15 incentivizes companies to maintain segregated computer systems.

16         Fourth, the parties must meet and confer to limit the

17 scope of the discovery requests so that the subpoenas comply

18 with Federal Rule of Civil Procedure 26 requirements that

19 discovery be "proportional to the needs of the case" and not

20 unduly burdensome.  Federal Rule of Civil Procedure 26(b).  My

21 hope is that the meet-and-confer will result in a targeted set

22 of discovery requests.  I will evaluate any renewed application

23 for a subpoena to determine whether the requests as framed

24 remain overbroad, unduly burdensome, and disproportionate to

25 the needs of the case.

22

O4B8BANC

1    Finally, I will evaluate whether to require

2    petitioners to pay the fees associated with any renewed

3    application for a subpoena.  Under Federal Rule of Civil

4    Procedure 45(d)(2)(B)(ii), "when a court grants a motion to

5    compel compliance with a subpoena, the court's order must

6    protect a person who is neither a party nor a party's officer

7    from significant expense resulting from compliance."  *In re*

8    *T-Systems Scheiz AG*, 2020 WL 7384007, at *2 (S.D.N.Y. 2020)

9    (collecting cases in which courts have applied Rule 45 to

10   allocate costs among parties in Section 1782 petitions).  "The

11   required protection from significant expense does not mean that

12   the requesting party necessarily must bear the entire cost of

13   compliance ...  A nonparty can be required to bear some or all

14   of its expenses where the equities of a particular case demand

15   it."  *Id.* (quoting *Law Firms of McCourts & McGrigor Donald*,

16   2001 WL 345233, at *1 (S.D.N.Y. Apr. 9, 2001)).  "Determining

17   each party's share of the cost of compliance turns on three

18   factors:  (1) whether the nonparty has an interest in the

19   outcome of the case; (2) whether the nonparty can more readily

20   bear the costs; and (3) whether the litigation is of public

21   importance." *Id.* (quoting *In re World Trade Ctr. Disaster Site*

22   *Litig.*, 2010 WL 3582921, at *1 (S.D.N.Y. Sept. 14, 2010)).

23   Here, obviously, Elliott Associates, L.P. and Elliott

24   International, L.P. are not parties to petitioners'

25   contemplated proceeding and, as far as I can ascertain,

**SPA-66**

O4B8BANC

1  petitioners' contemplated proceeding is not of public

2  importance.  I expect to solicit additional information from

3  the parties about their respective ability to pay the costs of

4  discovery when I evaluate any application for a subpoena.

5          III.  Conclusion.

6          For the foregoing reasons, I deny petitioners'

7  application with respect to the A&M Respondents, Elliott

8  Investment Management, L.P., and Elliott Management Corp.  I am

9  open to granting the request as to Elliott Associates, L.P. and

10  Elliott International, L.P.  However, any renewed application

11  for a subpoena must be more narrowly tailored following a

12  meet-and-confer with counsel for Elliott.  And I expect to take

13  up the question of whether and to what extent petitioners must

14  pay for the cost of that discovery.  My hope is that

15  petitioners and Elliott will be able to come to an agreement

16  regarding the scope of the incremental discovery requested.

17          So, thank you very much, counsel, for your time.  That

18  completes my decision.  I will issue a short order later today,

19  or perhaps tomorrow, that will point to the transcript of

20  today's proceeding.  Again, I very much hope, counsel, that you

21  will be able to work to come to an accommodation with respect

22  to the potential subpoenas to these two entities.

23          So that's it.  Anything else that we need to take up

24  before I adjourn?

25          First, counsel for petitioner.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SPA-67

24

O4B8BANC

1          MR. KIM:  We have nothing to add, your Honor.  Thank
2    you.
3          THE COURT:  Counsel for A&M.
4          MS. KLEIN:  No, your Honor.  Thank you very much.
5          THE COURT:  Counsel for Elliott.
6          MR. TYSSE:  No, your Honor.  Thank you.
7          THE COURT:  Thank you all.  This proceeding is
8    adjourned.
9          (Adjourned)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

SPA-68

| | | |
|---|---|---|
| ████ | | ████████████ |
| ████ | | ████████████ |
| 04/16/2024 | 66 | ORDER. For the reasons stated on the record during the conference held on April 11, 2024, Petitioners' application at Dkt. No. 12 is denied with respect to Respondents Alvarez & Marsal France SAS, Alvarez & Marsal, Inc., Alvarez & Marsal Transaction Advisory Group, LLC, Alvarez & Marsal Holdings, LLC, Elliott Investment Management, L.P., and Elliott Management Corp. The Court will consider revised subpoena requests as to Respondents Elliott Associates, L.P. and Elliott International, L.P. (the Elliott Entities) consistent with the Court's ruling. Petitioner and the Elliott Entities are directed to meet and confer regarding the scope of any renewed application to the Court. Those parties are directed to submit a status letter to the Court no later than May 1, 2024. (HEREBY ORDERED by Judge Gregory H. Woods) (Text Only Order) (wv) (Entered: 04/16/2024) |
| ████ | █ | ████████████ |
| ████ | █ | ████████████ |
| ████ | █ | ████████████ |
| ████ | █ | ████████████ |
| ████ | █ | ████████████ |